**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:14-CV-00079-RLV-DCK**

| | | |
|---|---|---|
| **ARNOLD PROPST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **HWS COMPANY, INC.; AND** | ) | |
| **SHERRILL FURNITURE COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendants' Motion for Summary Judgment (Doc. No. 16), Plaintiff's Motion to Strike the Declaration of William Smith (Doc. No. 17), and Plaintiff's Motion to Strike the Declaration of Jimmie Link (Doc. No. 18). Because the parties' submissions are filed and pending, they are now each ripe for this Court's review.

After a thorough examination of the record, the parties' briefs, and applicable law, the Court **GRANTS** Defendants' Motion for Summary Judgment ("Defendants' Motion") and **DENIES** Plaintiff's Motions to Strike. Accordingly, judgment shall be entered by the Clerk in favor of the Defendants for the reasons discussed more thoroughly below.

## I.    PRELIMINARY MATTERS

Before analyzing the merits of the Defendants' Motion, the Court must first discuss the Plaintiff's motions to strike the declarations of William Smith and Jimmie Link – declarations which the Defendants submitted in support of their Motion. *See* [Doc. No. 17]; [Doc. No. 18]. In his motions to strike, the Plaintiff raises numerous argumentative objections to the Defendants' submissions. The Court declines to address each of the Plaintiff's challenges, or to issue a separate order respecting the same, for a variety of reasons. First and foremost, a slew of Plaintiff's

objections (and Defendants' submissions) are wholly irrelevant to the ultimate issues pending before the Court. The parties have seemingly gone to great lengths to place before this Court every fact produced during discovery, either in support of Defendants' Motion or in opposition to it, whether those facts are relevant to the Motion or not. The parties are reminded that, on a motion for summary judgment, the *only* matter of consequence is whether there exists a *genuine issue* of *material fact*. *See*, *e.g.*, Fed. R. Civ. Pro. 56(a). The Court does not concern itself with irrelevant matters – such as, for example, the history of Hickory White since the early 1900s – and neither should the parties.[1] Because the Court is fully capable of trimming the fat from the parties' briefs, the Court declines to engage in an exhaustive analysis of each and every objection made to the Defendants' evidentiary submissions. *See*, *e.g.*, *Wane v. Loan Corp.*, 926 F. Supp. 2d 1312, 1317-1318 (M.D. Fla. 2013) ("This Court is capable of separating the wheat from the chaff on a motion for summary judgment . . . ."); *Jennison v. Hartford Life & Accident Ins. Co.*, 2011 U.S. Dist. LEXIS 85623, at *9-10 (N.D.N.Y 2011); *Carone v. Mascolo*, 573 F. Supp. 2d 575, 580 (D. Conn. 2008) ("The parties to an action should have faith that the court knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision simply upon the self-serving *ipse dixit* of a particular party." (internal citations and quotation marks omitted)); *accord Smith v. N.Y. Times*, 1996 U.S. Dist. LEXIS 21013, at *5 (D.S.C. 1996) ("Factual disputes that are irrelevant or unnecessary will not be counted." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1987))); *Holsey v. Collins*, 90 F.R.D. 122, 123 n.2 (D. Md.

---

[1] The Court must also highlight the excessive nature of some of the Defendants' submissions. For example, the Declaration of William Smith is twenty-three pages long and contains more than sixty paragraphs of testimony. [Doc. No. 16-15] (Smith Declaration). A great deal of these paragraphs are superfluous, irrelevant, and duplicative of either prior paragraphs within the declaration or of Smith's deposition testimony. This type of practice is disfavored; not only because it muddies the waters, but because it also slows the Court's ability to discern the relevant issues, uncover disputed issues of material fact, and to justly and speedily resolve the Motion so as not to delay further proceedings unnecessarily.

1981) (noting that the Court is under no "duty to expend [its] resources by sorting through irrelevant submissions.").

Second, throughout the motions to strike, the Plaintiff has attempted to wedge-in additional summary judgment arguments that were not expressly contained in, or elaborated upon, in his opposition brief to the Defendants' Motion. "It is not this court's responsibility to research and construct the parties' arguments[.]" *See Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011). Aside from the fact that, for all practical purposes, this type of "incorporation by reference" allows the Plaintiff to skirt the page limitations imposed by this Court's local rules, *see* LCvR 7.1(D), W.D.N.C., Plaintiff has essentially asked this Court to read everything it has filed and, after doing so, construct a coherent argument against the Defendants' Motion – a task which the Plaintiff was obligated to do *within* his opposition brief. Accordingly, the Court will only consider Plaintiff's arguments against summary judgment to the extent they appear in Plaintiff's opposition brief, unless, as will be highlighted below, the Court considers a specific objection to evidentiary submissions on which the Court relies in ruling on the Defendants' Motion.

Third, to the extent the voluminous record contains disputes of fact, the Court will assume that those disputes are specifically highlighted by the parties' summary judgment briefs. The Court will not play "archaeologist with the record," *Arkin v. Bennett*, 282 F. Supp. 2d 24, 33 n.4 (S.D.N.Y. 2003), by setting out on its own treasure hunt to discover issues of fact that the parties should have brought to its attention through specific, consolidated, and concise briefing. *See*, *e.g.*, *Garmin Ltd. v. TomTom, Inc.*, 468 F. Supp. 2d 988, 1000 (W.D. Wis. 2006) ("A party opposing a motion for summary judgment must show its whole hand[.]"); *see also Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the 'put up or shut up' moment in a lawsuit, when a party must show what

evidence it has that would convince a trier of fact to accept its version of the events." (citation and quotation marks omitted)); *Respironics, Inc. v. Invacare Corp.*, 2008 U.S. Dist. LEXIS 1174, at *10-11 (W.D. Penn. 2008); *accord Robinson v. Prince George's Cnty*, 465 Fed. App'x 238, 240 (4th Cir. 2012) ("The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, but must come forward with specific facts showing that there is a genuine issue for trial." (quotation marks and citation omitted)).

Finally, a motion to strike is no longer the favored (or authorized) method of challenging the inadmissible nature of evidentiary submissions at the summary judgment stage. Since the 2010 amendment to the Federal Rules of Civil Procedure, a motion to strike is technically not available to motions for summary judgment; rather, courts should treat the issues raised by such a motion as objections to the evidence and, if the Court finds the objections have merit, the improper evidence may simply be disregarded by the Court. *See* Fed. R. Civ. Pro. 56(c)(2) (providing that a party "may object" that the "material cited to support or dispute a fact cannot be presented in a form admissible in evidence"); *accord* Fed. R. Civ. Pro. Adv. Comm. Notes (2010 Amendments, Subdivision (c)); *see also*, *e.g.*, *OFI Int'l, Inc. v. Port Newark Refrigerated Warehouse*, 2015 U.S. Dist. LEXIS 2926, at *2-3 (D.N.J. 2015); *Hall v. Louisiana*, 2014 U.S. Dist. LEXIS 102852 (M.D. La. 2014); *Chase v. Ace Hardware Corp.*, 2014 U.S. Dist. LEXIS 15525, 21-22 (S.D. Ala. 2014); *Wanamaker v. Town of Westport Bd. of Educ.*, 2013 U.S. Dist. LEXIS 101849, at *2-6 (D. Conn. 2013); *Adams v. Valega's Prof. Home Cleaning, Inc.*, 2012 U.S. Dist. LEXIS 157550 (N.D. Ohio 2012) (collecting cases); *Ankney v. Wakefield*, 2012 U.S. Dist. LEXIS 64628 (W.D. Pa. 2012). The objection procedure adopted by the 2010 amendment is akin to an objection made at trial, and there is no longer a need to file a separate motion to strike. Instead, unless a local rule or standing order specifies otherwise, the parties are to make their evidentiary objections *within* their summary

judgment briefing itself. *See Wanamaker*, 2013 U.S. Dist. LEXIS 101849, at *5 ("If a party wishes to argue that an asserted material fact is not supported by the evidence, that party may do so in its summary judgment briefing." (quotation marks and citation omitted)).

Consequently, the Court construes the Plaintiff's motions to strike as mere objections to certain assertions contained in the various declarations submitted in support of the Defendants' Motion. To the extent the Court relies on any of the Defendants' submissions to which an objection has been made, the Court will discuss the specific objection, as is relevant, within the body of the Order below. However, to the extent the Plaintiff requests the Court enter an order respecting each and every objection contained in his motions to strike, asks the Court to consider arguments in opposition to summary judgment that are not specifically contained in Plaintiff's opposition brief, or requests the Court to scour the voluminous record for Plaintiff, those requests are **DENIED**.

## II. BACKGROUND

### A. Factual Background

#### 1. *General*

Plaintiff Arnold Propst is a male citizen of Burke County, North Carolina. [Doc. No. 1-1] at ¶ 1 (Complaint); [Doc. No. 4] at ¶ 1 (Answer). Defendants HWS Company, Inc. (hereinafter, "Hickory White")[2] and Sherrill Furniture Company (hereinafter, "Sherrill") are furniture manufacturers in North Carolina, and employ sufficient numbers of persons to meet the jurisdictional requirements of the ADA and FMLA. [Doc. No. 1-1] at ¶¶ 2-4 (Complaint); [Doc. No. 4] at ¶¶ 2-4 (Answer). Hickory White is a wholly owned subsidiary of Sherrill, having been purchased by Sherrill in 1997. [Doc. No. 1-1] at ¶ 5 (Complaint); [Doc. No. 4] at ¶ 5 (Answer);

---

[2] The record shows that Defendant Hickory White had a predecessor company, which is the company that originally hired the Plaintiff. However, this fact is not material to the disposition of this matter. Therefore, the Court will simply refer to both entities as "Hickory White."

*see also* [Doc. No. 16-15] at p. 3 (¶ 5) (Smith Declaration); [Doc. No. 16-18] at p. 3 (¶ 4) (Monroe Declaration).

Harold W. Sherrill serves as President for both Hickory White and Sherrill Furniture. [Doc. No. 1-1] at ¶ 5 (Complaint); [Doc. No. 4] at ¶ 5 (Answer). William Smith has been employed by Sherrill since 1986. [Doc. No. 16-15] at p. 2 (¶ 3) (Smith Declaration). He serves as a Vice President of Operations for Sherrill Furniture and is responsible for "all divisions in the Sherrill organization." [Doc. No. 16-15] at p. 3 (¶ 4) (Smith Declaration); *see also* [Doc. No. 11] at ¶ 3 (Joint Stipulation). As Vice President of Operations, Smith has overseen the maintenance functions throughout the Sherrill organization since 1994. [Doc. No. 16-15] at p. 5 (¶ 10) (Smith Declaration). In 1997, Smith assumed second-line supervisory responsibility over Hickory White's maintenance operations in partnership with Mike Walker, the Hickory White maintenance department supervisor. [Doc. No. 16-15] at p. 5 (¶ 11) (Smith Declaration). Mark Bailey is the manager of the Hickory White plant that employed Plaintiff. [Doc. No. 16-1] at pp. 22-23 (Plaintiff's Deposition). Thad Monroe is Sherrill's Chief Operating Officer. [Doc. No. 16-18] at pp. 2-3 (¶ 3) (Monroe Declaration). Bryan Milleson is Sherrill's Chief Financial Officer. [Doc. No. 16-18] at pp. 4-5 (¶¶ 9, 12) (Monroe Declaration). Jimmie Link is Hickory White's human resources manager. [Doc. No. 16-1] at p. 47 (Plaintiff's Deposition).

## 2. *Plaintiff's Background and Duties*

Prior to his employment with Hickory White, Plaintiff was a partner at his family's construction business for approximately twenty years. *See* [Doc. No. 16-1] at p. 5 (Plaintiff Deposition). Plaintiff eventually left his family's business and began working for Hickory White in November 1989, as a member of its maintenance department. [Doc. No. 1-1] at ¶¶ 6, 22 (Complaint); [Doc. No. 4] at ¶¶ 6, 22 (Answer); [Doc. No. 16-1] at p. 5 (Plaintiff Deposition).

Hickory White employed Plaintiff and operated the plant where he primarily worked. [Doc. No. 1-1] at ¶ 5 (Complaint); [Doc. No. 4] at ¶ 5 (Answer).

Plaintiff worked for Hickory White as a general maintenance mechanic. [Doc. No. 16-1] at p. 12 (Plaintiff Deposition). However, Plaintiff's role as a maintenance mechanic left little room for discretion. He testified that his job duties were constrained to doing "as [he] was told to do as jobs were delegated" and "handed down" to him. [Doc. No. 16-1] at p. 28 (Plaintiff Deposition). Any time a machine broke – Plaintiff was asked to repair it. [Doc. No. 16-1] at p. 28 (Plaintiff Deposition); [Doc. No. 16-2] at p. 43 (Plaintiff Deposition). If Hickory White needed inspections completed (e.g., its fire extinguishers needed to be inspected on a monthly basis), Plaintiff was asked to do them. [Doc. No. 16-1] at pp. 28-29 (Plaintiff Deposition); [Doc. No. 16-2] at pp. 43-45 (Plaintiff Deposition). If general building maintenance was needed (e.g., broken water lines, wall replacement, asphalt and concrete repair, support reinforcement, roof repair), Plaintiff performed the maintenance. [Doc. No. 16-1] at pp. 28-30, 40-42 (Plaintiff Deposition); [Doc. No. 16-2] at pp. 43-45 (Plaintiff Deposition); [Doc. No. 19-5] at p. 7 (Plaintiff Deposition). Plaintiff would also fill-in for absent workers, as needed. [Doc. No. 16-1] at p. 30 (Plaintiff Deposition); [Doc. No. 16-2] at pp. 43-45 (Plaintiff Deposition).

To accomplish the tasks to which he was assigned, Plaintiff would utilize skills of the trade, such as welding and fabricating.[3] *See*, *e.g.*, [Doc. No. 16-1] at pp. 42-43 (Plaintiff Deposition); [Doc. No. 16-2] at pp. 43-45 (Plaintiff Deposition); [Doc. No. 19-5] at pp. 2-7 (Plaintiff Deposition). Plaintiff testified that his skills included the following: water and compressed air plumbing; "electrical" and electrical wiring; carpentry; heavy equipment operation; masonry;

---

[3] "Fabricating" is not synonymous with "welding;" though they can go hand-in-hand. [Doc. No. 19-5] at p. 5 (Plaintiff's Deposition). Fabricating means to "start from a piece of material" and "make it into something." [Doc. No. 19-5] at p. 5 (Plaintiff's Deposition).

boiler tending; running a "wood hog;" replacing broken windows; running computer cables; welding; fabricating; and trimming shrubbery. [Doc. No. 16-2] at pp. 43-46 (Plaintiff Deposition); [Doc. No. 19-5] at pp. 2-7 (Plaintiff Deposition). Plaintiff considered himself to be a skilled and qualified worker. *See*, *e.g.*, [Doc. No. 16-2] at p. 17 (Plaintiff Deposition).

3.    *Plaintiff's Supervisors*

From the early 1990s until sometime between 2010 and 2011, Mike Walker supervised Plaintiff. [Doc. No. 16-1] at pp. 8-9, 11, 20 (Plaintiff Deposition). Plaintiff considered Mr. Walker to be a "super boss;" indeed, Plaintiff "never, ever had a problem" with Mr. Walker for the entirety of their working relationship. [Doc. No. 16-1] at p. 13 (Plaintiff Deposition). Sometime between 2000 and 2009, Mike Walker asked Plaintiff to become his foreman; however, Plaintiff turned down the opportunity because he did not wish to take on the additional responsibilities. [Doc. No. 16-1] at pp. 13-15 (Plaintiff Deposition). After Mr. Walker passed away, William Smith was designated as Plaintiff's "acting" supervisor.[4] [Doc. No. 11] at ¶ 3 (Joint Stipulation); [Doc. No. 16-1] at pp. 8-9 (Plaintiff Deposition); [Doc. No. 16-13] at p. 7 (Smith Deposition).

As Plaintiff's new supervisor, Smith directed Plaintiff's work, and assumed hiring and firing authority over the department.[5] *See* [Doc. No. 16-1] at pp. 9, 20, 28-30, 33-34 (Plaintiff Deposition); accord [Doc. No. 16-15] at pp. 5, 11 (¶¶ 12, 32) (Smith Declaration). Smith primarily maintained an office at Sherrill; however, he would visit Hickory White on occasion to observe the work being performed and to direct Plaintiff's workflow. *See* [Doc. No. 16-1] at pp. 37-41

---

[4]  Prior to Mr. Walker's death, Smith had supervised Plaintiff for approximately eleven years "indirectly." [Doc. No. 16-13] at p. 17 (Smith Deposition). After Mr. Walker's death, Smith took a more active role in Plaintiff's supervision as "acting" supervisor. *See*, *e.g.*, [Doc. No. 16-13] at p. 17 (Smith Deposition); [Doc. No. 16-1] at pp. 9, 20, 28-30, 33-34 (Plaintiff's Deposition).

[5]  Smith would either direct Plaintiff's work "directly" or have a team lead (Howard Childress or Shane Crawford) delegate work to Plaintiff. *See* [Doc. No. 16-1] at pp. 8-9, 20, 34 (Plaintiff Deposition). However, "leadership" of the maintenance department was primarily handled by Childress and/or Crawford. [Doc. No. 16-1] at p. 43 (Plaintiff Deposition). Prior to his death, Walker retained firing and firing authority over the department, though he would often consult Smith on these decisions. [Doc. No. 16-15] at p. 5 (¶ 12) (Smith Declaration).

(Plaintiff Deposition); [Doc. No. 16-15] at p. 13 (¶ 35) (Smith Declaration) (testifying that he supervised the maintenance department "remotely" following as acting supervisor). Smith's presence at Hickory White became more frequent after Walker's passing. [Doc. No. 16-1] at p. 44 (Plaintiff Deposition). Smith directed Plaintiff to perform work related to "business maintenance" and "probably not" much else. *See* [Doc. No. 16-1] at pp. 41-42 (Plaintiff Deposition). Plaintiff testified that his relationship with Smith somewhat mirrored that of his relationship with Walker. He testified that he and Smith "had a good relationship," they "never, ever had a cross word," Smith never gave him negative feedback, and Smith "always told" Plaintiff that he "did a good job." [Doc. No. 16-1] at p. 43 (Plaintiff Deposition). Plaintiff "like[d]" Smith. [Doc. No. 16-1] at p. 44 (Plaintiff Deposition). Smith testified that Plaintiff was qualified and a "tremendous asset" to his maintenance staff. [Doc. No. 19-7] at p. 4 (Smith Deposition).

Plaintiff's maintenance role and duties did not change after Mike Walker passed away. [Doc. No. 16-1] at pp. 20, 30 (Plaintiff Deposition). Rather, Plaintiff "continued to do the same things [he] always did" as a member of the maintenance department. [Doc. No. 16-1] at p. 20 (Plaintiff Deposition). Plaintiff's workload only decreased "when things got slow," and the decrease in workload affected everyone employed in maintenance – not just Plaintiff. [Doc. No. 16-1] at p. 30 (Plaintiff Deposition). During the 2011 through 2012 period in which Smith was Plaintiff's supervisor, Plaintiff received a pay increase and was not disciplined. [Doc. No. 16-2] at p. 2 (Plaintiff Deposition); [Doc. No. 19-5] at p. 20 (Plaintiff Deposition). Hickory White employed Plaintiff in its maintenance department until his termination on January 18, 2013. [Doc. No. 1-1] at ¶ 6 (Complaint); [Doc. No. 4] at ¶ 6 (Answer); [Doc. No. 16-1] at p. 10 (Plaintiff Deposition); [Doc. No. 11] at ¶ 1 (Joint Stipulation).

4.      *Plaintiff's Medical Situation and Requests for Leave*

During his employment with Hickory White, Plaintiff took leave from work on four occasions. In the early or mid-2000s, Plaintiff took leave for an operation on his shoulder. [Doc. No. 16-1] at p. 45 (Plaintiff Deposition); [Doc. No. 16-7] at p. 2 (Personnel Records). In or around January 2009, Plaintiff took FMLA leave for an operation concerning a deviated septum. [Doc. No. 16-1] at pp. 45-46, 50 (Plaintiff Deposition); [Doc. No. 16-6] at pp. 3-4 (Personnel Records). In or around January 2012, Plaintiff was on leave as a result of a facial laceration. [Doc. No. 16-1] at p. 46 (Plaintiff Deposition); [Doc. No. 16-7] at pp. 3-4 (Personnel Records). Finally, in December 2012 to January 2013, Plaintiff took FMLA leave for surgery on his eyelids to correct a condition which the parties repeatedly describe as "droopy eyelids."[6] [Doc. No. 16-1] at p. 46 (Plaintiff Deposition); [Doc. No. 1-1] at ¶¶ 9, 12 (Complaint); [Doc. No. 4] at ¶¶ 9, 12 (Answer). None of Plaintiff's requests for leave were ever denied, nor did any problems arise from Plaintiff's requests for leave. *See* [Doc. No. 16-1] at pp. 48-49 (Plaintiff Deposition). Plaintiff testified that no one from Hickory White treated him negatively as a result of his multiple requests for leave or his medical issues. *See* [Doc. No. 16-1] at pp. 47-51 (Plaintiff Deposition); [Doc. No. 16-2] at pp. 18-19 (Plaintiff Deposition).

Prior to January 2012, Plaintiff had tolerated "droopy eyelids" for "a couple of years." [Doc. No. 16-2] at p. 1 (Plaintiff Deposition). Plaintiff's condition reportedly affected his peripheral vision; however, it did not affect his ability to perform activities of daily living, his ability to drive, or his ability to perform his work duties. *See* [Doc. No. 16-2] at pp. 2-3 (Plaintiff Deposition); [Doc. No. 19-14] at p. 2 (Letter from Dr. Lowry). Plaintiff never requested any job

---

[6] The Court is aware that "droopy eyelids" is not a defined scientific term for the Plaintiff's condition. *See* [Doc. No. 19-14] at p. 2 (Letter from Dr. Lowry) (indicating Plaintiff's eye condition to have been "upper eyelid pseudoptosis"). However, the parties do not refer to the condition's scientific name in their submissions and, therefore, neither will the Court. *See* [Doc. No. 16-2] at p. 1 (Plaintiff Deposition).

modifications from Hickory White as a result of his condition. [Doc. No. 16-2] at p. 2 (Plaintiff Deposition). Plaintiff attests that his "droopy eyelids" caused him to suffer "[n]o limitations other than [he] probably [could not] see as well at night." [Doc. No. 16-2] at p. 3 (Plaintiff Deposition). Plaintiff's doctor, Dr. Lowry at Morganton Eye Physicians, recommended, upon Plaintiff's request, that he have corrective outpatient surgery on his eyelids to rectify the condition.[7] [Doc. No. 16-1] at p. 52 (Plaintiff Deposition); [Doc. No. 16-2] at pp. 1, 7-8 (Plaintiff Deposition); [Doc. No. 19-14] at p. 2 (Letter from Dr. Lowry) (stating that Plaintiff underwent a surgical procedure named "bilateral upper lid blepharoplasty").

Once he decided to have corrective surgery, in late-2011 Plaintiff directly approached Jimmie Link regarding a possible leave of absence. [Doc. No. 16-1] at pp. 47-48, 52 (Plaintiff Deposition); [Doc. No. 16-2] at p. 1 (Plaintiff Deposition). Plaintiff told Link that his "droopy eyelids" were affecting his peripheral vision and that he would be undergoing surgery to correct the problem. [Doc. No. 16-1] at p. 52 (Plaintiff Deposition). Link told Plaintiff that he should "just let [her] know when" the surgery would occur and Hickory White will "give [him] the papers to take to [his] doctor . . . ." [Doc. No. 16-1] at pp. 47-48 (Plaintiff Deposition). Link informed Plaintiff that he would be able to take the leave he needed for the surgery and, "[a]ny time [he] wanted off, just let her know." *See* [Doc. No. 16-2] at pp. 1, 6 (Plaintiff Deposition). After discussing the need for leave with Link, Plaintiff had an accidental fall, which required the eye surgery to be postponed. *See*, *e.g.*, [Doc. No. 19-5] at p. 14 (Plaintiff Deposition). Plaintiff suffered a facial laceration, which required him to take time off from work in January 2012. *See* [Doc. No. 19-5] at pp. 9, 14 (Plaintiff Deposition); [Doc. No. 16-1] at p. 46 (Plaintiff Deposition); [Doc. No.

---

[7] Plaintiff also underwent a "laser resurfacing" procedure in order to remove the skin wrinkles around his eyes. [Doc. No. 16-2] at p. 8 (Plaintiff Deposition). However, Plaintiff testified that this procedure was not related to his "droopy eyelids," except to the extent the procedure removed skin wrinkles that had developed because of the condition. [Doc. No. 16-2] at p. 8 (Plaintiff Deposition).

16-7] at pp. 3-4 (Personnel Records). The eye surgery was rescheduled for approximately one-year later. [Doc. No. 19-5] at p. 14 (Plaintiff Deposition); [Doc. No. 16-2] at pp. 6-7 (Plaintiff Deposition). Plaintiff informed Link of the new surgery date and she agreed to let him take FMLA leave. [Doc. No. 19-5] at pp. 14-15 (Plaintiff Deposition).

On or about December 18, 2012, Hickory White provided Plaintiff with a "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)" form, which Plaintiff's doctor completed and returned to Link. [Doc. No. 1-1] at ¶ 12 (Complaint); [Doc. No. 4] at ¶ 12 (Answer); [Doc. No. 16-3] at pp. 2-3 (Personnel Records); [Doc. No. 16-4] at pp. 1-3 (Personnel Records). Based on the information provided by Plaintiff (and his doctor), Link approved Plaintiff to take a leave of absence, commencing December 31, 2012. [Doc. No. 1-1] at ¶¶ 9, 12 (Complaint); [Doc. No. 4] at ¶¶ 9, 12 (Answer); [Doc. No. 16-2] at p. 6 (Plaintiff Deposition). Plaintiff's eyelid surgery took place on January 3, 2013. [Doc. No. 16-2] at p. 7 (Plaintiff Deposition).

Other than Link, Plaintiff discussed his need for surgery only with Shane Crawford. [Doc. No. 16-2] at p. 2 (Plaintiff Deposition); [Doc. No. 16-2] at p. 47 (Plaintiff Deposition) (stating that he did not discuss the leave of absence with William Smith). Plaintiff testified he knew his FMLA rights and would have gone to Link with any questions he may have had. [Doc. No. 16-1] at p. 48 (Plaintiff Deposition). Following the surgery, Plaintiff's eye condition was fully corrected. [Doc. No. 16-2] at p. 3 (Plaintiff Deposition). Plaintiff was on an approved FMLA leave at the time of the layoff in January 2013. [Doc. No. 11] at ¶¶ 6-7 (Joint Stipulation); [Doc. No. 1-1] at ¶¶ 10, 14 (Complaint); [Doc. No. 4] at ¶¶ 10, 14 (Answer). Sometime between January 15 and 16, 2013, Plaintiff notified Defendant Hickory White that his doctor released him to return to work on or about Monday, January 21, 2013. [Doc. No. 1-1] at ¶ 15 (Complaint); [Doc. No. 4] at ¶ 15

(Answer); [Doc. No. 19-6] at pp. 10-11 (Link Deposition); [Doc. No. 19-4] at p. 8 (Crawford Deposition). Plaintiff was terminated on January 18, 2013 and was not restored to the position held prior to his FMLA leave. [Doc. No. 11] at ¶¶ 1, 6-7 (Joint Stipulation); [Doc. No. 1-1] at ¶¶ 6, 14, 18 (Complaint); [Doc. No. 4] at ¶¶ 6, 14, 18 (Answer); [Doc. No. 16-13] at p. 24 (Smith Deposition); [Doc. No. 19-5] at p. 26 (Plaintiff Deposition); [Doc. No. 16-1] at p. 10 (Plaintiff Deposition).

Neither Hickory White nor Sherrill sent Plaintiff the FMLA eligibility notice, designation notice, or notice of rights and responsibilities (i.e., USDOL Form Nos. WH-381 and 382 or their equivalent), as required by law, in December 2012 or early January 2013. [Doc. No. 11] at ¶ 18 (Joint Stipulation). Thad Powell had not asked for FMLA leave in the two years prior to the January 2013 layoff. [Doc. No. 11] at ¶ 9 (Joint Stipulation). Plaintiff's co-worker, Ken Chaffin, was also on FMLA leave when he was terminated by Smith through application of the 2013 RIF. *See, e.g.*, [Doc. No. 19-7] at pp. 20-21 (Smith Deposition).

5.     *The Reduction-In-Force*

In the mid-2000s, Hickory White struggled with economic pressures arising from the infiltration of cheap foreign "casegoods"[8] imports in the North Carolina furniture market. [Doc. No. 16-18] at p. 3 (¶ 5) (Monroe Declaration).[9] Beginning in 2007, as a result of the economic

---

[8]  "Casegoods" is a furniture industry term for furnishings made of hard materials, specifically wood (not upholstered). *See* [Doc. No. 16-15] at p. 3 (¶ 5) (Smith Declaration).

[9]  Thad Monroe is the Chief Operating Officer of Sherrill Furniture Company. [Doc. No. 16-18] at pp. 2-3 (¶ 3) (Monroe Declaration). As such, he is familiar with the records and finances of both Sherrill and Hickory White, which is a wholly-owned subsidiary of Sherrill. [Doc. No. 16-18] at p. 3 (¶ 4) (Monroe Declaration). Further, he has twenty-six years of experience in the North Carolina furniture industry. [Doc. No. 16-18] at p. 3 (¶ 5) (Monroe Declaration). "It is presumed that a corporate officer has knowledge of the acts of his corporation. To cast doubt upon his personal knowledge there must be some further factual showing." *Cent. Carolina Bank & Trust Co. v. Weiss, Peck & Greer, L.L.C.*, 2003 U.S. Dist. LEXIS 4477, at *12 n.2 (M.D.N.C. 2003) (citing *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1342 (4th Cir. 1992)). Plaintiff has not challenged the affidavit testimony of Mr. Monroe, or otherwise brought forth factual evidence showing that his testimony cannot be trusted. Therefore, the Court will rely on Mr. Monroe's testimony to the extent it does not materially conflict with other record evidence.

recession, Hickory White's finances took a considerable hit. [Doc. No. 16-18] at pp. 3-4 (¶ 6) (Monroe Declaration). Its sales declined drastically between 2007 and 2010, which forced it to implement a variety of cost-saving measures to shore-up its floundering business model. [Doc. No. 16-18] at p. 4 (¶ 6) (Monroe Declaration). These cost-saving measures included multiple layoffs. [Doc. No. 16-18] at p. 4 (¶ 6) (Monroe Declaration).

While business seemed to improve somewhat between 2010 and 2012, in late-2012 Hickory White's sales plummeted by fifteen percent (15%) – or $1.25 million – and its costs increased by fifty percent (50%). [Doc. No. 16-18] at pp. 4-5 (¶¶ 7-9) (Monroe Declaration). By November 2012, in order to cauterize the apparent hemorrhage of money, Thad Monroe (Sherrill's Chief Operating Officer), after consulting with Bryan Milleson (Sherrill's Chief Financial Officer), recommended that Hickory White implement a reduction-in-force ("RIF") measure immediately. [Doc. No. 16-18] at pp. 4-5 (¶¶ 9, 12) (Monroe Declaration). Though Monroe's recommendation was not rejected by leadership, a final decision on the RIF was deferred until January 2013. [Doc. No. 16-18] at pp. 4-5 (¶¶ 7-9, 12) (Monroe Declaration). On January 16, 2013, as a result of Hickory White's continued financial decline, a final decision was made to implement an RIF at Hickory White. [Doc. No. 16-18] at p. 5-6 (¶ 13) (Monroe Declaration); [Doc. No. 19-6] at pp. 12-13 (Link Deposition). The decision was reached by both Sherrill and Hickory White leadership during a meeting at Sherrill's main factory. [Doc. No. 16-18] at pp. 5-6 (¶¶ 13-14) (Monroe Declaration); [Doc. No. 16-16] at pp. 5-7 (Link Deposition); [Doc. No. 19-6] at pp. 12-13 (Link Deposition); [Doc. No. 11] at ¶ 2 (Joint Stipulation). Smith was not present at this meeting. [Doc. No. 16-18] at p. 7 (¶ 17) (Monroe Declaration); *see* [Doc. No. 16-16] at p. 22 (Smith Deposition); *see also* [Doc. No. 19-7] at pp. 14, 16 (Smith Deposition) (representing that he first learned of the layoff decision when Thad Monroe came to him following the meeting); [Doc. No. 19-6] at p. 13

(Link Deposition) (representing that there was no one from the maintenance department present at the meeting).

During the January 16, 2013 meeting, no decision was made regarding the number of employees to be laid off, the specific employees to be terminated, the selection criteria to be used, or the specific dollar figure to be saved. [Doc. No. 16-18] at p. 6 (¶ 15) (Monroe Declaration); [Doc. No. 16-16] at pp. 5-7 (Link Deposition); [Doc. No. 19-6] at pp. 12-13 (Link Deposition). Instead, those decisions were mostly left to appropriate managers within Hickory White's leadership. [Doc. No. 16-18] at p. 6 (¶ 15) (Monroe Declaration); [Doc. No. 16-16] at pp. 5-7 (Link Deposition); [Doc. No. 19-6] at pp. 12-13 (Link Deposition). However, because maintenance employees had not been subjected to the immediately preceding layoffs, the meeting's attendees decided to reduce the employees in Hickory White's maintenance department by two employees.[10] [Doc. No. 16-18] at pp. 6-7 (¶ 16) (Monroe Declaration); [Doc. No. 16-16] at pp. 5-7 (Link Deposition); [Doc. No. 19-6] at pp. 12-13 (Link Deposition).

Monroe communicated the decision to William Smith sometime between January 16 and 17.[11] [Doc. No. 16-18] at p. 7 (¶ 17) (Monroe Declaration); [Doc. No. 16-16] at p. 7 (Link Deposition); [Doc. No. 19-6] at p. 2 (Link Deposition). Monroe advised that "[Smith] was responsible for deciding which [m]aintenance personnel would be retained" and which two individuals would be terminated.[12] [Doc. No. 16-18] at p. 7 (¶ 17) (Monroe Declaration); [Doc. No. 16-13] at p. 10 (Smith Deposition); [Doc. No. 19-6] at p. 2 (Link Deposition); [Doc. No. 11]

---

[10] Ultimately, in addition to the two maintenance personnel subject to the layoff, six other Hickory White employees were also terminated. [Doc. No. 16-16] at pp. 7-8 (Link Deposition). Smith did not terminate those employees. *See* [Doc. No. 16-16] at p. 7 (Link Deposition) (testifying that it was "left up to the plant to decide who the other [six] people were [that were] going to be [laid off]").

[11] Smith testified that this meeting included only himself and Thad Monroe. [Doc. No. 19-7] at p. 14 (Smith Deposition).

[12] Link testified that she had no part in deciding which maintenance employees to terminate. *See* [Doc. No. 19-6] at p. 2 (Link Deposition). Plaintiff has produced no evidence to rebut or contradict that testimony.

at ¶ 3 (Joint Stipulation) ("The decision to lay off Plaintiff . . . and his co-worker in Hickory White's Maintenance Department was made by William Smith, a Vice President at Sherrill Furniture."); accord [Doc. No. 16-15] at p. 14 (¶ 37) (testifying that because he was the "first level of management that had been overseeing" the department, Smith "was responsible for deciding which employees would be retained"). However, Monroe did not direct Smith to lay off any particular employee or to utilize any specific criteria. [Doc. No. 16-18] at p. 7 (¶ 17) (Monroe Declaration).

After being informed that he needed to reduce the maintenance staff by two employees, Smith decided to terminate Plaintiff and another maintenance worker, Ken Chaffin. [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at p. 17 (¶ 48) (Smith Declaration). In coming to his decision, Smith deemed the following criteria important: (1) the ability of the residual maintenance staff to "maintain[] the facilities" and continue "day-to-day operation" of the plant, with a de-emphasis on preventative maintenance; (2) the availability of funding for future operations and projects;[13] and (3) his perception of the residual workforce's skills as compared to the "existing and future needs" of Hickory White's maintenance department. [Doc. No. 16-13] at p. 13 (Smith Deposition); [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at pp. 14-16 (¶¶ 39-42) (Smith Declaration); [Doc. No. 16-18] at p. 7 (¶ 18) (Monroe Declaration). Smith determined that the skill-sets which were most important to satisfying his criteria were as follows: excellence in (1) electrical; (2) electronics and controls; (3) machining; and (4) welding and fabrication. [Doc. No. 16-15] at pp. 14-15 (¶ 39) (Smith Declaration). Having identified the skills

---

[13] Smith testified that funding for the maintenance department had been constricting since 2008. [Doc. No. 16-13] at pp. 9-10 (Smith Deposition). He testified that, at the time of the January 2013 layoff, the maintenance department's funding was "greatly restricted," and he was on a "zero spend basis," such that funding was unavailable to meet the "tremendous" preventive maintenance needed to maintain Hickory White's infrastructure. [Doc. No. 16-13] at pp. 8-10 (Smith Deposition).

needed to satisfy the criteria he deemed important, Smith evaluated the five maintenance employees to determine which of them to select for the layoff. [Doc. No. 16-13] at p. 13 (Smith Deposition); [Doc. No. 24-2] at p. 5 (Smith Deposition).

At the time of the layoffs, the maintenance department consisted of five maintenance employees: Howard Childress; Shane Crawford; Thad Powell; Arnold Propst; and Ken Chaffin.[14] [Doc. No. 16-15] at p. 16 (¶ 43) (Smith Declaration); *see* [Doc. No. 16-13] at p. 7 (Smith Deposition). Smith decided that he needed to retain an expert in electrical, and he believed his expert to be Howard Childress.[15] [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at p. 17 (¶ 46) (Smith Declaration). Smith also considered Childress to be a "recognized and trusted leader" within the maintenance department. [Doc. No. 16-15] at p. 17 (¶ 46) (Smith Declaration). Further, Smith decided that he needed to retain an expert in "electronics and controls," and he believed his expert to be Shane Crawford.[16] [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at p. 17 (¶ 45) (Smith Declaration). Shane Crawford was also considered by Smith to be a "team leader" in the maintenance department.[17] [Doc. No. 16-15] at p. 17 (¶ 45) (Smith Declaration); <u>accord</u> [Doc. No. 19-4] at p. 5 (Crawford Deposition). Finally, Smith decided that he needed to retain a general machinist and welder who was capable of performing production repairs and fabrication tasks. [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at p. 17 (¶ 47) (Smith Declaration). Smith believed the person best capable of performing those tasks

---

[14] The maintenance department was comprised of those same employees at the time Mike Walker passed away in late-2010. [Doc. No. 16-1] at pp. 11-12 (Plaintiff Deposition).

[15] Plaintiff testified that, because Childress was "the senior guy" in the maintenance department, Childress focused his work on "the electrical end" of the jobs tasked to the department after Walker passed away. [Doc. No. 16-1] at pp. 31-33 (Plaintiff Deposition).

[16] Similarly, Plaintiff testified that, following Mike Walker's passing, Crawford would focus his skills on "electrical related jobs." [Doc. No. 16-1] at pp. 31-33 (Plaintiff Deposition). Crawford testified that his primary duties were "electrical, electronic repair," and acting as a lead, along with Childress, to coordinate with Smith regarding different job assignments for the department. [Doc. No. 19-4] at p. 5 (Crawford Deposition).

[17] Plaintiff does not contest that Childress and Crawford should have been retained during the layoff. [Doc. No. 16-2] at pp. 21 (Plaintiff Deposition).

to be Thad Powell.[18] [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at p. 17 (¶ 47) (Smith Declaration).

Through process of elimination, Smith determined he needed to terminate Plaintiff and Mr. Chaffin, the two remaining maintenance employees. [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at p. 17 (¶ 48) (Smith Declaration). Smith chose Plaintiff and Mr. Chaffin because he "did not have funding for the types of projects" that those employees were working on, and because he considered Childress, Crawford, and Powell's skills to be better suited, comparatively, for maintaining the Hickory White plant in the future. [Doc. No. 16-3] at p. 21 (Smith Deposition); [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at pp. 17-18 (¶¶ 45-49) (Smith Declaration).

In coming to his decision, Smith testified that he relied on his "perception" – i.e., his subjective understanding of Hickory White's current and future needs, funding levels for the department, and the qualifications and skills of the maintenance employees. *See*, *e.g.*, [Doc. No. 16-13] at p. 22 (Smith Deposition). While contemplating his decision, Smith did not review any personnel records, written performance evaluations, job descriptions, or training records.[19] [Doc No. 16-13] at p. 23 (Smith Deposition); [Doc. No. 16-15] at p. 15 (¶ 40) (Smith Declaration). Nor did he document his evaluation or decision-making process in writing. *See* [Doc. No. 16-13] at p. 13 (Smith Deposition). Instead, he chose to engage in a subjective evaluation of the relative skills and proficiencies of the maintenance department employees based upon (1) his own personal

---

[18] Plaintiff testified that Powell was assigned fabrication and welding projects following Walker's passing. *See* [Doc. No. 16-1] at p. 35 (Plaintiff Deposition).

[19] In his declaration, Smith testified that he did not consult these prior records because they would be "outdated" and would not provide him with insight regarding how the skill-sets of the employees would beneficially serve the future needs of Hickory White after January 2013, which was the primary timeframe on which he was focused. [Doc. No. 16-15] at p. 15 (¶ 40) (Smith Declaration).

observations of their work;[20] (2) information communicated to him over the years by Walker (prior to his passing); and (3) information previously communicated to him from team leads and other managers (such as Crawford and Childress). *See* [Doc. No. 16-15] at p. 15 (¶ 40) (Smith Declaration); [Doc. No. 19-7] at p. 11 (Smith Deposition). At the time of his decision, Smith did not consult with anyone to gather more information or advice regarding the decision he had to make. [Doc. No. 11] at ¶ 17 (Joint Stipulation). Smith testified, however, that he did not have to consult documents or the views of others because the decision was "obvious" to him based on the facts and economics of the company. [Doc. No. 16-13] at p. 23 (Smith Deposition); [Doc. No. 19-7] at p. 19 (Smith Deposition).

Smith communicated his decision to Plaintiff on January 18, 2013.[21] [Doc. No. 16-13] at p. 24 (Smith Deposition); [Doc. No. 19-5] at p. 26 (Plaintiff Deposition); [Doc. No. 1-1] at ¶¶ 6, 18 (Complaint); [Doc. No. 4] at ¶¶ 6, 18 (Answer); [Doc. No. 16-1] at p. 10 (Plaintiff Deposition); [Doc. No. 11] at ¶ 1 (Joint Stipulation). The phone conference included William Smith, Plaintiff, and Jimmie Link. [Doc. No. 16-13] at pp. 24-25 (Smith Deposition); [Doc. No. 19-5] at pp. 26-27 (Plaintiff Deposition); [Doc. No. 1-1] at ¶ 18 (Complaint); [Doc. No. 4] at ¶ 18 (Answer). Originally, Smith intended to ask Plaintiff to come in and speak with him; however, after prodding by Plaintiff, Smith decided to convey the layoff decision over the phone. [Doc. No. 16-13] at pp. 24-26 (Smith Deposition); [Doc. No. 24-1] at p. 7 (Link Deposition). Link told Plaintiff that he was being terminated because Hickory White instituted a RIF and "[his] name was on the list to

---

[20] Smith testified that he personally observed the maintenance employees perform their duties at various points. *See* [Doc. No. 19-7] at pp. 3-8, 11-12 (Smith Deposition); [Doc. No. 16-1] at pp. 38-41 (Plaintiff Deposition). However, Smith did not necessarily observe all employees performing all jobs in the maintenance department at all times. *See*, *e.g.*, [Doc. No. 19-7] at pp. 3, 7-8, 12-13 (Smith Deposition).

[21] Before deciding to terminate Plaintiff, it was Smith's understanding that Plaintiff would be returning to work from his medical leave on the following Monday, January 21, 2013. [Doc. No. 16-13] at pp. 24-25 (Smith Deposition); [Doc. No. 19-7] at p. 2 (Smith Deposition) ("[Plaintiff] was cleared to come back to work. We were looking forward to having him come back to work at which point I was informed that I had to reduce the staff of our maintenance department.").

be laid off . . . ." [Doc. No. 16-2] at p. 10 (Plaintiff Deposition); *see* [Doc. No. 16-13] at p. 26 (Smith Deposition) ("I recall telling him that [Hickory White] [was] having a layoff and that he was – he had been caught in that action."). Smith represented that Plaintiff was being laid off because Hickory White was no longer "allocating any money to repair roofs."[22] [Doc. No. 16-2] at p. 14 (Plaintiff Deposition). Plaintiff concedes that Smith "may have said some more stuff, but [he] don't remember." [Doc. No. 16-2] at p. 13 (Plaintiff Deposition). Smith's recollection of the call is similarly hazy. *See* [Doc. No. 16-13] at p. 26 (Smith Deposition) ("I recall the specific conversation, but the specific words, I do not recall."). In response, Plaintiff told Link and Smith that he did not agree with the decision; however, he did not specify to them why he disagreed.[23] [Doc. No. 16-2] at pp. 10-11, 14-15 (Plaintiff Deposition). As of his last date of active employment, Plaintiff was performing his job duties satisfactorily. [Doc. No. 11] at ¶ 5 (Joint Stipulation).

Plaintiff filed an EEOC charge on May 1, 2013. [Doc. No. 1-1] at ¶ 21 (Complaint); [Doc. No. 4] at ¶ 21 (Answer). The EEOC issued a "Notice of Rights to Sue" on January 30, 2014. [Doc. No. 1-1] at ¶ 23 (Complaint); [Doc. No. 4] at ¶ 23 (Answer). This action commenced soon thereafter. *See*, *generally* [Doc. No. 1] (Notice of Removal); [Doc. No. 1-1] (Complaint).

---

[22] Smith does not remember specifically limiting his statement to roof repair. In his deposition, Smith represented that he told Plaintiff that he was being laid off because there was no longer funding for "many of the projects" that the maintenance department had been doing. [Doc. No. 16-13] at p. 27 (Smith Deposition).

[23] Plaintiff later testified that he disagreed with the decision because "[he] was out on FMLA and by rights [he] had 12 weeks . . . ." [Doc. No. 16-2] at pp. 10-11 (Plaintiff Deposition). Plaintiff also testified that he disagreed with the decision because he was an experienced and qualified worker with "seniority," that he did "most [of the] work," and that he believed that another worker (Thad Powell) should have been terminated instead based on Plaintiff's perception of Powell's performance-abilities, such as him being a "slow worker." [Doc. No. 16-2] at pp. 20-27 (Plaintiff Deposition). At the time of the January 2013 layoff, Plaintiff had been employed with Hickory White for fifteen years longer than had Thad Powell. [Doc. No. 11] at ¶ 10 (Joint Stipulation). However, Plaintiff testified that he was unaware of Powell's qualifications, and that he did not know whether Smith shared his perception regarding Powell's abilities. [Doc. No. 16-2] at pp. 24, 26 (Plaintiff Deposition). Plaintiff also testified that he does not think "experience in the furniture industry" was a qualification considered by Smith in making the layoff determination. [Doc. No. 16-2] at p. 27 (Plaintiff's Deposition). Plaintiff admits that Childress and Crawford were properly retained, and contests only the decision to retain Powell over him. *See* [Doc. No. 16-2] at pp. 21 (Plaintiff Deposition).

B.    Procedural Background

On March 6, 2015, Defendants filed their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Doc. No. 16]. Defendants seek judgment in their favor on all of Plaintiff's claims. In their Motion, the Defendants argue that summary judgment should be entered against Plaintiff because (1) Plaintiff has not established a *prima facie* case of disability discrimination under the Americans with Disabilities Act (the "ADA"); (2) Plaintiff has not established a *prima facie* case of age discrimination under the Age Discrimination in Employment Act (the "ADEA"); (3) Plaintiff has not established a *prima facie* case of retaliation under the Family and Medical Leave Act (the "FMLA"); (4) even if Plaintiff has established his *prima facie* cases, Defendants have offered a legitimate, nondiscriminatory/non-retaliatory reason for Plaintiff's termination and he cannot demonstrate such reason to be pretext; (5) Plaintiff's state law claims for wrongful termination under the North Carolina Equal Employment Practices Act (the "NCEEPA") fails for the same reasons as Plaintiff's federal age and disability discrimination claims; (6) Plaintiff cannot demonstrate that Defendants unlawfully interfered with his rights under the FMLA; and (7) Plaintiff has failed to prove that he is entitled to certain damages sought by his Complaint.

Each of these issues having been properly and timely presented, the Court will now discuss and analyze each of the Defendants' challenges.

**III.    DISCUSSION**

A.    Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to support or oppose a summary judgment motion, a party is required to cite

to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *accord Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).

It is well-established that the mere existence of "some" factual disputes will not defeat summary judgment; rather, the dispute presented must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247-248 (emphasis in original); *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Only legitimate disputes over facts that might affect the outcome of the suit under relevant governing law fall within that category. *See Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 374 (4th Cir. 2012). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Abstract or conjectural doubts, minor discrepancies, and points irrelevant to the "material" facts are not genuine or material and do not cast sufficient doubt on the validity of testimony to preclude the entry of summary judgment. *Emmett*, 532 F.3d at 297; *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). The non-movant cannot demonstrate a triable issue of disputed fact by building one inference upon another. *Emmett*, 532 F.3d at 297 (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Although it is certainly true that "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party," *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (en banc), it is equally true that a

court is "well within its discretion in refusing to ferret out the facts that counsel has not bothered to excavate." *Cray Commc'ns. Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994).

Finally, in employment disputes, such as the one at bar, the Court and the parties must never lose track of the context in which the dispute has arisen. In North Carolina, "absent an employment contract for a definite period of time, both employer and employee are generally free to terminate their association at any time and without reason." *See*, *e.g.*, *Head v. Adams Farm Living, Inc.*, 775 S.E.2d 904, 909, 2015 N.C. App. LEXIS 705 (N.C. Ct. App. 2015). Further, there is no general federally protected right to "just cause" protection in private sector employment. Instead, in North Carolina, it is the exception, not the rule, that an employee is vested with a cause of action arising out of the termination of his employment. *See Head*, 775 S.E.2d at 909 (adhering to the employment-at-will doctrine absent a contractual right or a "public policy exception" which vests the employee with a cause of action). Under federal law, a plaintiff must demonstrate that his termination from private employment was the result of some sort of statutorily prohibited discriminatory animus or the violation of another federally protected right; otherwise federal law will be "converted from one preventing discrimination . . . to one ensuring dismissals only for just cause to all people . . . ." *See Moore v. Eli Lilly & Co.*, 990 F.2d 812, 816 (5th Cir. 1993) (citing *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1504-05 (5th Cir. 1988)). It is under this rubric that the Court will now consider the arguments presented.

1.     *Prima Facie Case*[24]

At the summary judgment stage, a plaintiff carries the initial burden of establishing the *prima facie* elements of his claims for wrongful termination under the ADA and retaliatory discharge under the FMLA. This burden is met by utilizing either direct or circumstantial evidence; specifically, evidence which tends to show the discriminatory or retaliatory motive of the plaintiff's employer. *See Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 375 (4th Cir. 2012); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). Here, Defendants have questioned Plaintiff's ability to make-out a *prima facie* case of discrimination and retaliatory discharge. In response, Plaintiff has brought forth no direct evidence showing that he was terminated as a result of discriminatory or retaliatory animus. Therefore, to survive summary judgment, Plaintiff "must establish a circumstantial case under the burden shifting framework set forth in [*McDonnell Douglas*]."[25] *Fields*, 493 Fed. App'x at 375 (applying burden shifting framework to ADA claim in reduction-in-force context) (citing *McDonnell Douglas Corp. v.*

---

[24] In his brief, Plaintiff makes passing reference to a "motivating factor" test in relation to his FMLA claim. [Doc. No. 19] at p. 10 (Plaintiff's Response Brief). However, Plaintiff's cited authority does not apply a "mixed-motive" analysis to FMLA retaliation claims. *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006). Except for Plaintiff's passing reference, the parties have made no mention of, nor argued, a "mixed-motive" theory of liability in relation to either the Plaintiff's FMLA claim or ADA claim. The Court has found no Fourth Circuit case law applying a "mixed-motive" analysis to FMLA claims and declines to apply it to Plaintiff's claim in the first instance. While the Fourth Circuit has applied a "mixed-motive" analysis in the ADA context, there is "a serious question as to whether [a] [p]laintiff may still seek to prove [his] ADA case through a mixed-motive theory" following the Supreme Court's *Gross v. FBL Fin. Services, Inc.* decision. *See Carr v. Mike Reichenbach Ford Lincoln, Inc.*, 2013 U.S. Dist. LEXIS 42501, *18-19 (D.S.C. 2013); *compare Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 174 (2009) (declining to apply mixed-motive analysis in ADEA context) *with Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999) (applying mixed-motive to ADA claim). Nevertheless, the Court need not resolve this issue because the parties appear to have settled on (some version of) the *McDonnel Douglas* test for both claims. Therefore, the Court will not analyze or apply a "mixed-motive" theory of liability to the claims discussed herein.

[25] The *McDonnell Douglas* proof scheme is appropriate when the parties dispute the fundamental reasoning underlying the plaintiff's discharge. Though it is helpful to the Court and the parties, the *McDonnell Douglas* proof scheme should not be applied in a "rigid, mechanized, or ritualistic" manner. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, (1978); *Halpern*, 128 F.3d at 196 n.6. Instead, it should be utilized as "merely a means to fine-tune the presentation of proof and, more importantly, to sharpen the focus on the ultimate question – whether the plaintiff successfully demonstrated that the defendant intentionally discriminated against him." *Ennis*, 53 F.3d at 59.

*Green*, 411 U.S. 792 (1973)); *Ranade v. BT Americas, Inc.*, 581 Fed. App'x 182, 183 (4th Cir. 2014) (applying *McDonnell Douglas* framework to FMLA retaliation claims "because [such] claims are analogous to Title VII retaliation claims"); *accord Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001).

In the ADA context, a plaintiff must establish a *prima facie* case of discriminatory discharge, which requires evidence demonstrating that (1) he was a member of the statutorily-protected class;[26] (2) he was discharged; (3) at the time of his discharge, plaintiff was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Fields*, 493 Fed. App'x at 375-76 n. 4; *see also Ennis*, 53 F.3d at 58-59. In the FMLA context, a plaintiff must present a *prima facie* case of retaliation by showing that (1) he engaged in activity protected by the FMLA; (2) his employer took adverse action against him; and (3) evidence exists which implies that the adverse action was causally connected to plaintiff's protected activity. *See Ranade*, 581 Fed. App'x at 183; *Mercer v. Arc of Prince Georges Cnty, Inc.*, 532 Fed. App'x 392, 399 (4th Cir. 2013); *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

If a plaintiff presents sufficient evidence to satisfy the underlying *prima facie* elements of each of his claims, then the burden of production "shifts" to the employer to offer a legitimate, nondiscriminatory explanation for its decision to terminate. *See Ennis*, 53 F.3d at 58 (ADA context); *Nichols*, 251 F.3d at 502 (FMLA context). "If the defendant meets this burden of production, the presumption created by the *prima facie* case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that [he] has been the victim of intentional

---

[26] To be a member of the statutorily-protected class, the Plaintiff must demonstrate that he was a "qualified individual" with a "disability" under the ADA. *See* 42 U.S.C. §§ 12102(1), 12112(a) (2013).

discrimination [or retaliation]." *See Ennis*, 53 F.3d at 58 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993)); *Nichols*, 251 F.3d at 502 (stating that the plaintiff retains the ultimate burden of persuasion to show that the defendant's "proffered explanation is pretext for FMLA retaliation").

For purposes of this Motion, the Court assumes, without deciding, that Plaintiff has met his *prima facie* showing of wrongful termination under the ADA and retaliatory discharge under the FMLA.[27] *See Fields*, 493 Fed. App'x at 376; *accord Ennis*, 53 F.3d at 58; *Nichols*, 251 F.3d at 502. Thus, pursuant to *McDonnell Douglas*, Defendants must now satisfy their burden to produce a legitimate, nondiscriminatory reason for the decision to terminate Plaintiff.

### 2. *Legitimate, Nondiscriminatory/Non-Retaliatory Reason*

As stated above, once the Plaintiff meets his *prima facie* burden, the burden of *production* then shifts to Defendants. The Defendants' burden of production is not onerous; rather, they must only "articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Ennis*, 53 F.3d at 58. Because an employer's burden is one of production, and not of persuasion, it "is not required to prove [the] absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir. 1992) (quoting *EEOC v. Western Electric Co. Inc.*, 713 F.2d 1011, 1014 (4th Cir. 1983)).

---

[27]  The Court makes this assumption, in part, because the briefing on this issue is wholly inadequate. First, Defendants cite and argue the wrong standard governing Plaintiff's ADA claim. *Compare* [Doc. No. 16-20] at p. 10 n. 20 (Defendants' Motion) *with Ennis*, 53 F.3d at 58-59. Second, the Plaintiff cites and argues different standards governing his FMLA claim. *See* [Doc. No. 19] at pp. 9-10 (Plaintiff's Response Brief). Third, the parties have haphazardly argued the elements of the standards they *did* cite – often incorporating arguments from other sections of their briefs, or sections of other briefs, without specifying how those arguments are applicable in context. As a result, without the benefit of focused briefing from the parties, the Court declines to engage in an improvident, singlehanded exploration of the validity of Plaintiff's *prima facie* case.

Defendants have offered a legitimate, nondiscriminatory reason for discharging Plaintiff from his employment with Hickory White. Defendants have shown that Hickory White was suffering substantial financial difficulties at the time Plaintiff was on leave for his eyelid procedure. The significant decline in Hickory White's financial stability required upper management to adopt a reduction-in-force policy, just as it had done during other financially challenging periods. The Fourth Circuit has commonly held, as have courts within its jurisdiction, that RIFs are legitimate, lawful reasons for terminating an employee. *See*, *e.g.*, *White v. Dalton*, 2000 U.S. App. LEXIS 18694, at *1-2 (4th Cir. 2000) (per curiam) ("Defendant presented a legitimate, nondiscriminatory reason for his decision: a reduction-in-force necessitated by declining profits."); *Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231, 234 (4th Cir. 1991) (holding that a RIF established legitimate nondiscriminatory business reason for employee's discharge, which employee did not overcome with showing of pretext); *Casey v. Plastic Omnium Auto Exterior, LLC*, 2013 U.S. Dist. LEXIS 12985, at *11-12 (D.S.C. 2013); *Gibbs v. Smitherman*, 2012 U.S. Dist. LEXIS 173776, at *13-14 (E.D.N.C. 2012); *Gibson v. AT&T Information Sys., Inc.*, 1991 U.S. Dist. LEXIS 19264 (M.D.N.C.1991) (summary judgment against ADEA plaintiff because employer offered RIF as legitimate business reason for plaintiff's lay off). Thus, as a general matter, Defendants have stated a lawful and legitimate reason for terminating Plaintiff – through the implementation of a reduction-in-force policy during challenging economic times.

However, case law suggests that an employer must go a bit further in RIF cases than simply pointing to its RIF policy (as a whole) and the financial reasons underlying it – indeed, the employer must offer a legitimate, lawful reason for having *applied* the RIF policy against the plaintiff/employee. *See*, *generally Fields*, 493 Fed. App'x at 376-77 (discussing the specific reasoning given for applying Verizon's RIF policy against the plaintiff – not simply allowing

Verizon to satisfy its burden by pointing to the RIF as a whole). Even under this more exacting inquiry, the Defendants have met their burden by offering specific reasons regarding why Hickory White's RIF policy was applied to Plaintiff.

Smith was told that, to carry out the RIF, he had to terminate two employees in the five-member maintenance department. This determination was reached by upper management (outside of Smith's presence) because no maintenance workers were dismissed in the immediately preceding layoffs. Ultimately, eight people were terminated during the layoff – two in maintenance and six in other departments. Smith testified that, to carry out this command, he established certain criteria to guide his decision. In short, Smith determined that he needed a residual workforce that would have, what he believed to be, the requisite skill-set to keep the "day-to-day" operational objectives of Hickory White on track, which comported with the maintenance department's funding levels and the "current and future" business needs of Hickory White. *See* [Doc. No. 16-13] at p. 13 (Smith Deposition); [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at pp. 14-16 (¶¶ 39-42) (Smith Declaration); [Doc. No. 16-18] at p. 7 (¶ 18) (Monroe Declaration). The Fourth Circuit has held that concern for the "existing and future" operational and business needs of a company is a legitimate and lawful reason for applying an RIF policy. *See Fields*, 493 Fed. App'x at 376; *Mereish v. Walker*, 359 F.3d 330, 335 (4th Cir. 2004); *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1418 (4th Cir. 1991). "Such a strategic business decision constitutes a legally sufficient justification" for an employee's termination. *See Mereish*, 359 F.3d at 335. Moreover, "budgetary constraints" have long-offered a legitimate, nondiscriminatory, and non-retaliatory reason for applying a RIF policy. *See*, *e.g.*, *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998).

Having identified the skills and duties relevant to his decision, Smith identified the employees he believed would produce a residual workforce capable of carrying out Hickory

White's operational and business goals within the budgetary constraints caused by its financial predicament. The selected employees – Childress, Crawford, and Powell – were retained; the remaining two maintenance employees – Propst and Chaffin – were terminated. *See* [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at p. 17 (¶¶ 45-47) (Smith Declaration). The procedure and consideration employed by Smith is undisputed.[28] The Court finds that Defendants have offered specific, legitimate, and lawful reasons for Plaintiff's termination under the RIF policy. Thus, the presumption of discrimination and retaliation created by Plaintiff's *prima facie* case "drops out." Plaintiff must now bring forth some evidence which creates a genuine dispute of material fact regarding whether the Defendants' explanation is pretextual in nature.

3.    *Pretext*

To withstand Defendants' motion for summary judgment, Plaintiff must now bring forth evidence tending to show that the Defendants' legitimate and lawful reasons were merely pretext for unlawful discrimination or retaliation. That is to say, Plaintiff must present *some* evidence creating a genuine dispute concerning the truth of the Defendants' proffered reason for discharging him, such that a reasonable trier of fact could find that the "real reason" underlying Plaintiff's discharge was either (1) his alleged disability; or (2) his lawful use of FMLA leave. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000); *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000). Plaintiff's evidence is lacking on both points, and thus his claims must fail.

A plaintiff can show pretext by demonstrating that the defendant's explanation is "unworthy of credence" or by "offer[ing] other forms of circumstantial evidence sufficiently probative of intentional discrimination." *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721

---

[28]  Plaintiff attempts to create a dispute of material fact concerning Smith's decision-making process in his response brief and motion to strike Smith's declaration. *See* [Doc. No. 19] at pp. 10-11 (Plaintiff's Response Brief). The Court will address Plaintiff's arguments in Section III.B.3. ("Pretext") below.

(4th Cir. 2002); *Wright v. N.C. Dep't of Health & Human Servs.*, 405 F. Supp. 2d 631, 636 (E.D.N.C. 2005). If an employer offers inconsistent explanations or justifications concerning its actions, then those inconsistencies are probative of pretext. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001). Mere conjecture and speculation, however, are insufficient to overcome a summary judgment motion. *See Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384, 1386 (4th Cir. 1987); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241-46 (4th Cir. 1982); *accord Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). Furthermore, "mere mistakes of fact are not evidence of unlawful discrimination." *See*, *e.g.*, *Price v. Thompson*, 380 F.3d 209, 215, n.1 (4th Cir. 2004); *Clark v. Creative Hairdressers, Inc.*, 2005 U.S. Dist. LEXIS 27182, at *40-41 (D. Md. 2005).

To prove pretext, a plaintiff must do more than present conclusory allegations of discrimination; rather, "concrete particulars are required." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). More than a "mere . . . scintilla of evidence" or the appearance of "some metaphysical doubt" concerning pretext must be presented. *See Anderson*, 477 U.S. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 668, 671 (E.D. Va. 2004). However, even if a plaintiff proves that an employer's proffered reason is false or inconsistent, "there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory [or retaliatory]." *Reeves*, 530 U.S. at 148.

Most importantly, this Court does not sit as some sort of general personnel management bureau, burdened with the duty to examine or second guess the ultimate wisdom or folly of an employer's legitimate business decisions. *See Fields*, 493 Fed. App'x at 378-79; *Rowe v. Marley, Co.*, 233 F.3d 825, 831 (4th Cir. 2005) (holding an employer's decision to discharge one employee over another is the type of decision this court is reluctant to second guess); *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005); *Henson v. Liggett Grp., Inc.*, 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate" applicable law.); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992) ("It is not . . . the function of this court to second guess the wisdom of business decisions."). Rather, the Court's "sole concern" is whether the reason for which the Plaintiff was discharged constituted unlawful discrimination or retaliation. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). "Thus, when an employer articulates a reason for discharging the [P]laintiff[,] not forbidden by law, it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [P]laintiff's termination." *DeJarnette*, 133 F.3d at 299 (quotations and citations omitted).

In his briefing, Plaintiff attempts to show pretext by asserting a variety of challenges to the Defendants' RIF explanation.[29] Plaintiff first argues that Defendants' stated explanation is pretext because it has "evolved" over time and is inconsistent. *See* [Doc. No. 19] at pp. 11-13, 22-23 (Plaintiff's Response Brief). The Court disagrees. Inconsistencies in an employer's explanation for its employment decisions is probative of pretext. *See*, *e.g.*, *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered

---

[29] Unless otherwise expressly noted, the Court construes Plaintiff's briefing to have asserted each of the following arguments in relation to both his ADA discrimination and FMLA retaliation claims.

inconsistent post-hoc explanations for its employment decisions is probative of pre-text.") (quoting *EEOC v. Sears Roebuck*, 243 F.3d 846, 852-53 (4th Cir. 2001)). However, minor discrepancies or elaborative discussion will not suffice – a plaintiff must point to actual conflicting explanations which relate to the core substance of the employer's articulated justification. *See*, *e.g.*, *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 212 (4th Cir. 2014); *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (finding that pretext is not established "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it"); *Calobrisi v. Booz Allen Hamilton, Inc.*, 2015 U.S. Dist. LEXIS 37014, at *15 (E.D. Va. 2015). "The Fourth Circuit has repeatedly held that[, while] inconsistent explanations of employment actions may be probative of pretext[,] different or varying explanations that are not materially inconsistent are not." *See Hunnicutt, v. S.C. Dep't of Revenue*, 2010 U.S. Dist. LEXIS 31695, *19 (D.S.C. 2010) (citations omitted).

Plaintiff claims that Smith's memory of his decision-making process has "evolved" during the time between his January 18, 2013 phone conversation (terminating Plaintiff), his deposition testimony, and the filing of his declaration (made in support of Defendants' motion for summary judgment). [Doc. No. 19] at pp. 11-13, 22-23 (Plaintiff's Response Brief). In support of this position, Plaintiff argues that, in his deposition, Smith testified that he reached his decision by considering only the "lack of funding for the types of projects" that Plaintiff had been working on, and argues this shows that he did not conduct any "analysis of the skills, abilities or training of [Plaintiff] . . . versus Powell or any other Maintenance Mechanic." [Doc. No. 19] at pp. 11-13, 22-23 (Plaintiff's Response Brief). Plaintiff then contrasts this testimony with Smith's declaration, which Plaintiff characterizes as "refined." [Doc. No. 19] at pp. 4, 11, 22-23 (Plaintiff's Response Brief). Plaintiff particularly takes issue with the portion of Smith's declaration which characterizes

Plaintiff's welding and machinist skills as "basic" and Powell's skills as "expert," even though both were rated "four out of five" in these areas by Smith in a 2008 evaluation. [Doc. No. 19] at pp. 11-13, 22-23 (Plaintiff's Response Brief).

The Court finds that the Defendants "[have] not engaged in the kind of shifting, inconsistent explanations that permit a reasonable inference of pretext." *See Calobrisi*, 2015 U.S. Dist. LEXIS 37014, at *15. The record shows that Defendants, through Smith, have never departed from their central justification for discharging Plaintiff – that Hickory White's financial difficulties required the maintenance department to reevaluate its allocation of resources to reflect the new business and operational goals of the company. Plaintiff's brief takes issue with Defendants' reasons by arguing that they have "evolved" over time; however, the Court finds that Smith's statements have merely elaborated on his initial explanation – not added "an entirely new rationale to [his] explanation." *EEOC v. Delta Chem. Corp.*, 2008 U.S. Dist. LEXIS 91480, at *24-25 (D. Md. 2008).

Smith and Link originally disclosed to Plaintiff that he was being terminated as a result of a RIF. Smith further disclosed that part of the reason Plaintiff was terminated was because Hickory White was no longer funding roofing projects – i.e., projects of the sort Plaintiff was working on.[30] Later, in a letter to Sherrill's human resources manager, Smith indicated that he terminated Plaintiff because he was the "least diversified" and because Hickory White "would not be

---

[30] Plaintiff takes issue with the fact that the types of projects he was working were not by choice, but at Smith's direction. *See*, *e.g.*, [Doc. No. 19] at p. 23 (Plaintiff's Response Brief). The Court fails to see how this attempted distinction is relevant. Plaintiff clearly testified that his "job" was to do as he was told and no more. *See* [Doc. No. 16-1] at pp. 28-30, 33-34 (Plaintiff Deposition). Plaintiff also testified that Smith had him work on "building maintenance-related issues," which included replacing and repairing walls and "roof[s]." [Doc. No. 16-1] at p. 41 (Plaintiff Deposition). If Smith directed him to do particular jobs, such as repairing or replacing a roof, it was Plaintiff's duty to do those jobs. The fact that Plaintiff's job did not carry with it the discretion for Plaintiff to choose his work is not a material or distinguishing fact. Further, the fact that Plaintiff testified that part of his job responsibilities was to repair roofs evidences that Smith's explanation, given during the impromptu termination-by-phone, is consistent with his other testimony, albeit incomplete.

undertaking any building or carpentry type projects . . . in this current workforce reduction." [Doc. No. 17-2] at p. 1 (Smith Letter). Finally, in his deposition and affidavit testimony, Smith testified that Plaintiff was terminated because Hickory White was suffering from financial difficulties, which required Smith to identify the "existing and future" needs of the company and the persons with the necessary skill sets to meet those needs. [Doc. No. 16-13] at p. 13 (Smith Deposition); [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at pp. 14-16, 17 (¶¶ 39-42, 45-47) (Smith Declaration); [Doc. No. 16-18] at p. 7 (¶ 18) (Monroe Declaration). Smith testified that "preventative maintenance" was no longer a priority, and, thus neither were the projects on which Plaintiff had been working. [Doc. No. 16-13] at p. 13 (Smith Deposition); [Doc. No. 24-2] at p. 5 (Smith Deposition); [Doc. No. 16-15] at pp. 14-16, 17 (¶¶ 39-42, 45-47) (Smith Declaration); [Doc. No. 16-18] at p. 7 (¶ 18) (Monroe Declaration).

There is nothing inconsistent between Hickory White's development of new business objectives, driven by decreased departmental funding, and a "consideration of which skill sets of which employees would be best used in which positions in order to implement" those new objectives. *See*, *e.g.*, *Calobrisi*, 2015 U.S. Dist. LEXIS 37014, at *16. Smith's elaboration on the decision-making process makes clear that the department's decreased funding, which impacted its ability to continue undertaking the type of work assigned to Plaintiff, affected the outcome of the RIF. Indeed, each of Smith's statements are undisputed, consistent, and constitute the same "central justification"[31] – i.e., money was no longer available for the maintenance department to continue performing the same work it had performed pre-RIF, thus some work and skill-sets had

---

[31] In addition, Smith's elaboration on his decision-making process did not occur because his memory "dramatically improved" during the time periods between each statement, a fact that distinguishes this case from other cases. *Compare Dennis*, 290 F.3d at 647. Smith never testified that he could not recall the process by which he made his decision. *Id.* Moreover, Plaintiff does not dispute that Hickory White was undergoing financial difficulties and had to implement a RIF. [Doc. No. 16-2] at pp. 39-40 (Plaintiff Deposition).

to be prioritized, while others were deemphasized. Plaintiff's work, unfortunately, fell on the latter end of that consideration.

Further, Plaintiff has not demonstrated that Smith's declaration is inconsistent with any tangible evidence. The only physical evidence cited by Plaintiff is a 2008 evaluation, drafted by Smith, which shows that Smith rated Plaintiff and Powell with the same numerical designation in the category of "welding/machining" – giving both a score of "four out of five."[32] *See* [Doc. No. 19] at pp. 11, 22 (Plaintiff's Response Brief); [Doc. No. 16-14] (2008 Evaluation). However, the cited 2008 evaluation was more than four years out-of-date at the time of the 2013 RIF. Further, there is no evidence in the record, except for Plaintiff's *ipse dixit*, to suggest that the "one to five" scale utilized by Smith in the 2008 evaluation covers the degrees between "basic" to "expert" level competency.[33] Moreover, the 2008 evaluation was developed *before* Smith took Walker's place as supervisor over the maintenance department; thus, Smith's consideration of the maintenance employees' skills *after* 2008 carries much more probative value simply because Smith was more actively involved in the department during the time period following Walker's death. It is entirely possible that Smith determined Powell had become more qualified than Plaintiff in those relevant areas by the time the 2013 RIF was adopted and implemented. Notably, the record shows this to

---

[32] The Court finds it curious that Plaintiff both relies on this evaluation in his response *and* seeks to have it excluded from evidence. *Compare* [Doc. No. 19] at pp. 11, 13, 18-19, 22 (Plaintiff's Response Brief) *with* [Doc. No. 17] at pp. 12-15 (Plaintiff's Motion to Strike Smith Declaration). Plaintiff's reliance on the 2008 evaluation constitutes a waiver of his objection to the evaluation's admissibility. *See*, *e.g.*, *Lane v. Sys. Application & Techs.*, 2015 U.S. Dist. LEXIS 27422, *9-10 (D. Md. 2015); *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012); *accord Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998) (holding that the defendant waived its hearsay objection to evidence proffered by the plaintiff in opposition to a motion for summary judgment where the defendant submitted the same evidence in support of its own prior motions).

[33] Indeed, the 2008 evaluation contains no description of what the scale means, and the same scale is utilized to assess employees on subject matter that does not lend itself to "basic" or "expert" level assessments, such as their attributes in the areas of "attitude," "trustworth[iness]," and "motivation." *See* [Doc. No. 16-14] (2008 Evaluation). Plaintiff deposed Smith on the evaluation but failed to elicit any testimony regarding the meaning of the scales. Plaintiff cannot now surpass summary judgment because of his failure to collect evidence that may support his argument.

be the case; at the time of the 2013 RIF, Powell was Smith's "go to" welder and machinist.[34] [Doc.

No. 16-15] at p. 19 (¶ 54) (Smith Declaration); [Doc. No. 19-4] at p. 7 (Crawford Deposition).[35]

Plaintiff has offered no evidence to demonstrate that, at the time of the 2013 RIF, he was *actually*

equally or more skilled than Powell in the relevant skill areas, or that Smith had considered

Plaintiff to be equally or more skilled than Powell. In other words, Plaintiff has produced no

evidence that directly controverts Smith's testimony that he considered Powell to be a more

qualified welder and machinist than Plaintiff at the time of the 2013 RIF. Because the 2008

evaluation was made four years prior to the 2013 RIF and because it does not necessarily reflect

Smith's opinion/assessment of Plaintiff and Powell's respective skills as of the date of the 2013

RIF, the Court finds that the generalized and imprecise 2008 evaluation is too far removed from

the 2013 RIF to carry the significant probative value necessary to create a genuine dispute of

material fact as to pretext.[36] *See*, *e.g.*, *Anderson*, 477 U.S. at 249-50 ("If the evidence is merely

---

[34] In fact, Plaintiff even concedes that Powell was a "good welder" – despite elsewhere claiming, quite contradictorily, that he was unqualified. *See* [Doc. No. 16-1] at p. 35 (Plaintiff Deposition). Plaintiff's witness, Ken Chaffin, also confirms Smith's testimony by testifying that "[b]efore Thad Powell was hired, [Plaintiff] was the primary welder and fabricator for many years . . . ;" however, "[w]hen Thad Powell was hired in 2006, he took over the shop. [Plaintiff] and I continued to assist Powell with welding and fabrication." [Doc. No. 19-2] at p. 2 (¶¶ 8-9) (Chaffin Affidavit).

[35] Plaintiff lodges only a general hearsay objection to Smith's testimony on this point. [Doc. No. 17] at p. 21 (Plaintiff's Motion to Strike Smith Declaration). The Court has addressed (and overruled) Plaintiff's hearsay objections in footnote 39, infra.

[36] Plaintiff also attempts to create disputes of fact regarding other minor issues. The Court is not persuaded by those attempts. First, Plaintiff argues there is a dispute regarding *who* suggested that two employees from the maintenance department should be eliminated. *See* [Doc. No. 19] at pp. 11-13, 22-23 (Plaintiff's Response Brief). Plaintiff argues that the record is inconsistent with regard to whether or not Mr. Sherrill ordered two maintenance employees be laid off. *Id.* Plaintiff points to Mr. Sherrill's deposition testimony to show that Mr. Sherrill denies having made any such suggestion during the January 16, 2015 meeting. *See* [Doc. No. 19] at pp. 11-13, 22-23 (Plaintiff's Response Brief); *accord* [Doc. No. 19-8] at p. 2 (Sherrill Deposition). The Court finds, to the extent a genuine dispute of fact exists on this issue, the dispute is immaterial to the Defendants' motion for summary judgment. Plaintiff has not alleged that (1) Mr. Sherrill was the final decision-maker for the maintenance department layoff; (2) Mr. Sherrill was the final decision-maker with regard to Plaintiff's termination; or (3) Mr. Sherrill held any sort of discriminatory intent or animus toward Plaintiff. In response to Defendants' motion, Plaintiff produced no evidence suggesting the existence of any of those scenarios. Thus, it is immaterial whether Mr. Sherrill suggested that two maintenance persons be terminated. The only material facts that exist in that regard are (1) that a decision was made to terminate two employees from maintenance, and (2) that the power to render a final decision regarding *whom* to terminate was laid on the desk of William Smith. The record shows there is no dispute as to those facts. Second, Plaintiff and Defendants disagree regarding whether Smith took responsibility for the decision to layoff Plaintiff during the January 18, 2013 call. Plaintiff contends that Smith shirked responsibility for the decision when Smith allegedly

colorable or is not significantly probative, summary judgment may be granted. (citations omitted));

*Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) ("[N]either unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment."); *Curry v. E-Systems*, 1995 U.S. App. LEXIS 34724, at *12-13 (4th Cir. 1995) ("[T]hough [evidence may] clearly [be] relevant to the issues," evidence that is "not significantly probative" of pretext "will not suffice" to preclude summary judgment for the employer.).

Plaintiff also argues that Smith's reasoning demonstrates pretext because he "was given no criteria" by which to make a decision. [Doc. No. 19] at pp. 10-11 (Plaintiff's Response Brief). This is a mischaracterization of Smith's testimony. While Plaintiff is correct in that Smith was not given

---

represented to Plaintiff that "this [was] not of [his] doing" and he "was not aware of this happening" because "[he] was not in on the – on the decision." [Doc. No. 19-5] at p. 28 (Plaintiff Deposition); *see* [Doc. No. 19] at pp. 13, 18-19, 22-23 (Plaintiff's Response Brief). Smith contends that he was misunderstood – that he only meant he had no part in the decision to have a layoff at Hickory White. *See* [Doc. No. 16-13] at p. 26 (Smith Deposition). Plaintiff's deposition testimony does indicate that he understood Smith's statement, at that time, to mean that Smith had not been the final decision-maker with regard to his termination. Under Rule 56, the Court must assume Plaintiff's version of events as true if it is reasonably inferable from the evidence. *See, e.g., Scott v. Greenville County*, 716 F.2d 1409, 1411 (4th Cir. 1983). Regardless, the Court does not find that this dispute concerns a material fact that can prevent summary judgment for Defendants. Even accepting Plaintiff's version of the dispute as true, it is immaterial whether Smith shirked responsibility for terminating Plaintiff during the phone call because (1) Smith and the Defendants admit that Smith was the final decision-maker with regard to Plaintiff's termination and (2) it is not reasonable to infer unlawful discrimination or retaliation simply because the decision-maker disclaimed responsibility at the time of the call. Instead, it is reasonable to infer Smith demurred as to responsibility because he considered the exchange to be incredibly awkward, which is how Smith characterized the call. *See* [Doc. No. 16-13] at pp. 25-26 (Smith Deposition). Moreover, Smith could have avoided taking responsibility for the decision for any number of reasons unconnected to invidious discrimination. Critically, Plaintiff even testified that, assuming Smith made the decision to terminate him, this would only be evidence that Smith "*could have*" discriminated against him – not that he *did* discriminate against him. *See* [Doc. No. 16-2] at p. 50 (Plaintiff Deposition) (testifying that "[i]f [Smith] had no knowledge of me being laid off, he probably couldn't discriminate against me, but if he did have knowledge [then] he could have, so I don't know . . . ."). Finally, Plaintiff takes issue with Link's EEOC statement, arguing that she told the EEOC that "the decision maker had no knowledge of [Plaintiff's] medical leave" when, in fact, Smith did have knowledge. [Doc. No. 19] at pp. 22-23 (Plaintiff's Response Brief); [Doc. No. 19-11] at p. 3 (EEOC Statement). Link claims that she intended this statement to refer to Mr. Sherrill, who she believed determined at the January 16, 2013 meeting that two individuals from the maintenance department should be terminated. [Doc. No. 19-6] at pp. 8-9 (Link Deposition). The Court does not find that this dispute concerns a material fact for three reasons. First, Smith readily admits that he knew Plaintiff was on leave at the time he was terminated. [Doc. No. 19-7] at p. 16 (Smith Deposition). Second, even construed in Plaintiff's favor, this evidence does not show that *Smith* acted with discriminatory or retaliatory intent when he terminated Plaintiff. Third, Link was not the decision-maker. Smith terminated Plaintiff – not Link – and the termination necessarily took place *before* the EEOC statement. Consequently, the Court finds that these minor issues of fact cannot prevent summary judgment in Defendants' favor.

any criteria by upper management, this does not mean that Smith did not actually employ any criteria, or that his decision was utterly arbitrary (*sans* an unlawful motive). Rather, as has been discussed, Smith testified that he developed his own criteria and used it to arrive at his decision. Further, as is discussed in Section III.B.2., supra, Smith's criteria was based on lawful considerations derived from business and operational necessity.

Next, Plaintiff asserts that Defendants' reasons are pretext because Smith "did not review personnel files, training records, previous assessments, or job descriptions" and did not "compare [the] experience or actual skills" of the maintenance employees before deciding whom to terminate. [Doc. No. 19] at pp. 10-11 (Plaintiff's Response Brief). These arguments must likewise fail. Importantly, Plaintiff's contention that Smith did not engage in a comparative analysis of the employees' skills, as such relate to Hickory White's needs, as he perceived each to be, is demonstrably refuted by the record testimony. The Court has discussed Smith's comparative analysis at length throughout this Order and will not repeat that discussion here. Moreover, Smith testified that there was no need to review Hickory White's files or records because he believed he sufficiently understood the five maintenance employees' qualifications and skills so as to arrive at a decision without a lengthy investigation. Smith also testified that any such records would not assist in his evaluation because they were "out of date" and not particularly relevant to his inquiry, which was focused on Hickory White's *future* needs. Smith testified that he utilized his opinion of the employees' skills to determine which of them would comprise the residual workforce that best fit Hickory White's existing and future needs. Plaintiff has cited no authority requiring an employer to perform an exhaustive review of its employment records before arriving at a decision to terminate an employee through implementation of a legitimate RIF policy. Indeed, the adequacy of Smith's investigation is not at issue; "the issue is whether discriminatory [or retaliatory] animus

motivated" Plaintiff's termination. *See Tucker v. Thomas Jefferson Univ.*, 484 Fed. App'x 710, 712 (3d Cir. 2012).

Throughout this litigation, Plaintiff has repeatedly suggested that Smith's decision must have been based on unlawful motives because Plaintiff subjectively evaluates his own skills and experience higher than those of Thad Powell, a fellow maintenance worker and the only comparator employee identified in the record.[37] *See* [Doc. No. 16-2] at pp. 15-17, 20-23, 26, 45-46, 49-50 (Plaintiff Deposition). Plaintiff's argument suggests that Smith was required to share his view. However, Plaintiff has produced absolutely no evidence showing that he was *actually and plainly* more qualified than Powell *at the time of his termination*.[38] *Compare Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639 n.4. (4th Cir. 2002) ("One way to prove the plaintiff's case would certainly be to show that [his] qualifications were so plainly superior that the employer could not have preferred another candidate.") *with Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 261 (4th Cir. 2006) (stating that where "a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the [employment] decision remains vested in the sound business judgment of the employer."). Plaintiff admits that he is unfamiliar with Powell's qualifications – specifically as they were at the time of his termination – and he admits that he did not supervise Powell's performance. *See*, *e.g.*, [Doc. No. 16-2] at pp. 23-24 (Plaintiff Deposition). Plaintiff also concedes that Powell was a "good welder,"

---

[37] Plaintiff suggests that Ken Chaffin was better qualified than Powell as well; however, Plaintiff has produced no evidence to support this assertion other than his own subjective beliefs and the subjective beliefs of Mr. Chaffin. *See* [Doc. No. 16-1] at p. 36 (Plaintiff's Deposition) (testifying Ken Chaffin was "just like" him); [Doc. No. 16-2] at pp. 1-2 (Chaffin Affidavit). Further, Plaintiff does not contest Smith's decision to keep both Crawford and Childress at Hickory White.

[38] Plaintiff cites to Shane Crawford's deposition to show that Powell was less qualified than Plaintiff; however, Plaintiff's cites do not support that proposition. [Doc. No. 19] at pp. 2, 7 (Plaintiff's Response Brief). The Court has reviewed Plaintiff's citations and finds that Crawford's testimony actually *supports* Smith's decision, in that he plainly testified that Powell's duties centered on welding, fabrication, and machining work. *See* [Doc. No. 19-4] at pp. 3, 6 (Crawford Deposition).

and Plaintiff's witnesses confirm Smith's testimony that, after his hire, Powell became the maintenance department's primary welder and fabricator. *See* [Doc. No. 16-1] at p. 36 (Plaintiff's Deposition); [Doc. No. 16-2] at pp. 1-2 (Chaffin Affidavit). Plaintiff has also failed to introduce any tangible evidence concerning Powell's comparative qualifications. As is discussed above, the 2008 evaluation is too far removed and too imprecise to establish a triable issue of fact.

Further, even if Plaintiff *was* more qualified than Powell, he has offered no evidence which shows that Smith knew or believed such to be true, or that Smith did not *actually believe* that Childress, Crawford, and Powell were better qualified for retention purposes.[39] *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998) ("[I]t is the perception of the decision maker that is relevant. . . not the opinions of [a plaintiff's] co-workers or other third parties."); *see also Ben-Levy v. Bloomberg*, 518 Fed. App'x 17, at *19 (2d Cir. 2013) ("While [plaintiff] repeatedly challenges the substance of his performance reviews, he does not present evidence to suggest that his managers did not actually hold those beliefs about his abilities nor does he offer evidence to

---

[39] The Court must address the Plaintiff's suggestion that it should disregard Smith's testimony as it relates to how he evaluated the proficiencies of each of the maintenance workers and how he came to the determination that Childress, Crawford, and Powell should be retained over Plaintiff and Chaffin. *See*, *generally* [Doc. No. 17] (Plaintiff's Motion to Strike Smith Declaration). Though Plaintiff's objections in this regard are numerous and lengthy, they can be congealed into a general objection that Smith's evaluation is not based on his own personal knowledge and, thus, constitutes inadmissible hearsay. These objections are without any merit. Rule 801 defines "hearsay," in part, as "a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Here, Smith's decision-making is not hearsay in the context in which it has been offered as evidence to the Court. In the employment context, the correctness (i.e., "truth") of the factual basis underlying the employer's decision to terminate the plaintiff is wholly irrelevant. Instead, the critical question is whether the decision to discharge was made in good faith and without discriminatory or retaliatory animus. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000). Consequently, the state-of-mind of the decision-maker (Smith) and the considerations he took into account when deciding to terminate the Plaintiff are appropriate and admissible evidence. *See Tinsley*, 155 F.3d at 444; *Youse v. Duke Energy Corp.*, 2003 U.S. Dist. LEXIS 26573, 4-6 (M.D.N.C. 2003). Further, it is undisputed that Smith is a corporate officer with supervisory authority over the maintenance department. Smith is, therefore, presumed to have knowledge of facts following within his ordinary duties and responsibilities. *Cent. Carolina Bank & Trust Co. v. Weiss, Peck & Greer, L.L.C.*, 2003 U.S. Dist. LEXIS 4477, at *12 n.2 (M.D.N.C. 2003) (citing *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1342 (4th Cir. 1992)). Thus, to the extent Smith relied on information outside his sphere of personal knowledge in making his decision (e.g., information relayed to him by Walker prior to his death and information relayed to him by Crawford, Childress, or others), such evidence is not hearsay and the Court may still consider it at summary judgment. For these same reasons, the 2008 evaluation is also admissible and may be considered by the Court, despite Plaintiff's waiver of his objection. *See* [Doc. No. 16-14] (2008 Evaluation).

undermine them."); *accord Price*, 380 F.3d at 215 n.1 (noting that "mistakes of fact" are not probative of discrimination or unlawful animus). Rather than offer tangible proof of Powell's qualifications as compared to Plaintiff's (as they stood at the relevant time), Plaintiff has offered only his own (and Ken Chaffin's) subjective assessments of Powell's relevant skill sets – which, at times, are contradictory. *See* [Doc. No. 16-1] at p. 35 (Plaintiff Deposition); [Doc. No. 19-2] at p. 2 (¶ 10) (Chaffin Affidavit). Not only are Plaintiff and Chaffin's subjective evaluations insufficient to create a genuine issue of material fact, they are wholly irrelevant because they do not contest the only evaluation that *is* relevant – that of the decision-maker, William Smith. *See*, *e.g.*, *Harrell v. Hutson*, 1994 U.S. App. LEXIS 19396, at *11 (4th Cir. 1994) ("While appellant may feel that appellees' actions were discriminatory a subjective belief that one has been discriminated against, no matter how fervent, cannot be the sole basis of judicial relief."); *Eng v. Norfolk Southern Corp.*, 2005 U.S. Dist. LEXIS 41468, at *18-19 (W.D. Va. 2005) ("[P]laintiff's argument is essentially that because he was a good employee and not promoted, Norfolk Southern must have discriminated against him . . . . This is not enough to overcome summary judgment."); *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 887 (D. Md. 2001) ("[A] plaintiff's own subjective belief that he is sufficiently qualified is insufficient to counter substantial evidence of legitimate nondiscriminatory reasons offered by a defendant."); *Al-Saji v. Virginia*, 1997 U.S. Dist. LEXIS 14884, at * (W.D. Va. 1997) ("[T]he plaintiff's subjective belief that he was the most qualified for the position is of no significance. The perception and assessment of the employer is all that is relevant." (citations omitted)); *see also Tinsley*, 155 F.3d at 444; *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."). The record makes clear that Smith valued Powell's abilities

as a welder, fabricator, and machinist over Plaintiff's skills as a carpenter and building/facilities maintenance worker – i.e., the most recent and relevant work experience in which each of these employees were engaged at the time of the RIF.

"[T]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria," so long as the employer's explanation of its reasons are "clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001). Though subjective in some respects, Smith's evaluation and decision-making process was not of the type rejected by courts as "wholly subjective and unarticulated" – Smith both articulated his criteria and the basis on which it was developed. *W. v. Mando Am. Corp.*, 2010 U.S. Dist. LEXIS 46784, at *3 (M.D. Ala. 2010) (finding the employer's reasoning not too subjective where its stated reason for favoring other employees over plaintiff was that plaintiff "would not work well with others"); *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("[S]ubjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons."); *accord Evans v. Tech. App. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (finding no discrimination where company offered substantial evidence that management considered the plaintiff not yet ready for a supervisory position despite considering her "good at her job"); *Safar v. Espy*, 1995 U.S. App. LEXIS 32651, at *4-6 (4th Cir. 1995) (citing *Tingley v. Henson Aviation, Inc.*, 789 F.2d 275, 277 (4th Cir. 1986)). Smith sufficiently articulated the criteria used to implement the RIF so as to give Plaintiff a full and fair opportunity to show pretext. Plaintiff has failed to do so. Plaintiff has produced no evidence demonstrating that, at the time of the RIF, Plaintiff was – either actually or perceived to be – plainly

more qualified than Powell in the relevant areas.[40] *See Wileman v. Frank*, 979 F.2d 30, 38 (4th Cir.

1992) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). Plaintiff

has also produced no evidence suggesting that Smith did not *actually believe* that Childress,

Crawford, and Powell were better qualified than Plaintiff (respecting the criteria he established),

or that Smith disregarded evidence that Plaintiff was actually and plainly more qualified;

consequently, this Court will not "second guess" his decision, even if it was unwise, unfair, or

incorrect. *See DeJarnette*, 133 F.3d at 299.

Plaintiff also argues that "statistical" evidence and the temporal proximity between

Plaintiff's FMLA leave and his termination demonstrate pretext. First, Plaintiff's attempt to show

pretext by arguing that "37.5%" of the employees terminated in the layoff (i.e., three employees –

Plaintiff, Chaffin, and an employee named "Brooks") were on FMLA leave at the time of the RIF,

and that other employees had been terminated in the past after having utilized FMLA leave,

necessarily fails. [Doc. No. 19] at pp. 7, 18 (Plaintiff's Response Brief). Plaintiff has only

presented evidence that two employees (Plaintiff and Chaffin) were terminated by Smith while on

FMLA leave.[41] Any other employees are irrelevant because they were terminated by different

decision-makers. "If different decision-makers are involved, employees are generally not similarly

situated." *Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 Fed. App'x 255 (4th Cir. 2007);

*Heyward v. Monroe*, 166 F.3d 332 (4th Cir. 1998) (per curiam) (same); *Tinsley v. Astrue*, 2010

---

[40]  The Court notes that throughout the briefing and deposition testimony, Plaintiff attempts to create a dispute of material fact concerning Plaintiff's other skills – such as his electrical, plumbing, or HVAC skills – as compared to Powell's. However, this line of argument is unpersuasive. Smith has testified, and Plaintiff has conceded, that the RIF determination essentially came down to whether Powell, Plaintiff, or Chaffin would be retained to perform the essential duties of welding, fabricating, and machining. Smith chose Powell as being the most qualified to perform *those essential duties*. All other duties (and competencies) were irrelevant to that determination and are irrelevant in this litigation.

[41]  Plaintiff has offered the affidavit testimony of Clyde J. Smith to show a fourth employee was terminated in 2009 while on FMLA leave; however, the affidavit puts forth no evidence to show that Smith was the decision-maker that terminated Clyde's employment. *See* [Doc. No. 19-3] (Clyde Smith Affidavit).

U.S. Dist. LEXIS 129367, 12-13 (S.D. W. Va. 2010); *Duggan v. Sisters of Charity Providence Hosps.*, 663 F. Supp. 2d 456, 468-469 (D.S.C. 2009).

Because his statistical evidence is irrelevant to the Court's inquiry, Plaintiff is left to argue that, out of the five maintenance employees constituting the pool subject to the 2013 RIF, Smith chose the two who were on FMLA leave in January 2013. *See* [Doc. No. 19] at p. 6 (Plaintiff's Response Brief). However, as has been discussed, Plaintiff does not contest that two employees had to be laid off, or that Childress and Crawford were appropriately retained. Thus, the pool was narrowed to three employees – two of whom were on FMLA leave at the time. The sheer restrictiveness of the pool of employees to which Smith had to apply the RIF, coupled with the requirement that he choose two out of the three of them, made it all the more likely that at least one of the chosen employees would be on FMLA leave. Plaintiff has produced no evidence demonstrating that Smith used FMLA leave as an unlawful determining factor in his decision. Therefore, the Court finds that the mere fact that Smith's decision resulted in the termination of two employees who were on FMLA leave (out of such a restrictive pool of potential contenders) does not give rise to an inference of pretext. *See*, *e.g.*, *Schaaf v. Trane U.S., Inc.*, 2014 U.S. Dist. LEXIS 56122, at *38-39 (D. Minn. 2014) ("Although . . . Collier and Schaaf were the only employees taking or recently taking FMLA leave and the only employees terminated from Boettcher's team and from the group of employees under Watson may be sufficient to meet the *prima facie* case, more is needed to show pretext." (citing *Lewis v. Aerospace Cmty. Credit Union*, 114 F.3d 745, 749-50 (8th Cir. 1997)); *see also Reid v. EG&G Tech. Servs.*, 2011 U.S. Dist. LEXIS 87201, at *4-5, 14-18 (E.D. Va. 2011) (rejecting plaintiff's argument that a jury issue on pretext was established because "he was the 'only minority in [the] group of Graphic Artist' and the only employee not to receive a 'proper' promotion"), *aff'd by* 466 Fed. App'x 288 (4th Cir. 2012).

Moreover, Plaintiff fails to show that the temporal proximity between his firing and his leave/eye surgery is sufficient to show pretext. Though Plaintiff has correctly pointed out that the temporal proximity of his discharge to his use of FMLA leave is sufficient to establish a *prima facie* case of retaliatory discharge, such evidence is *not* sufficient to create a jury issue on the question of pretext.[42] *See, e.g., Staley v. Gruenberg*, 575 Fed. App'x 153, 156 (4th Cir. 2014) ("[T]emporal proximity alone is not sufficient to establish that [Plaintiff's] engagement in protected activity was a 'but for' cause" of his discharge. (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012)).

Finally, conspicuously absent from all of the Plaintiff's arguments are citations to *any* evidence tending to show that, *even if* the Defendants' reasons for applying the RIF against Plaintiff are false or inconsistent, sufficient evidence of disability discrimination or FMLA retaliation otherwise exists such that a rational trier of fact can find in favor of the Plaintiff at trial.[43] *See Reeves*, 530 U.S. at 148. Indeed, Plaintiff's submissions are laden with only speculation, *ipse dixit*, and supposition – almost as if any *actual* evidence of discrimination/retaliation was a mere afterthought. The Court has carefully and extensively reviewed the record, and finds that it has been presented with no evidence of disability discrimination or FMLA retaliation.

---

[42] The Court notes that there is no evidence of temporal proximity related to the onset of Plaintiff's alleged eye disability or the date he notified Hickory White of the alleged disability. Plaintiff informed Hickory White of the need for surgery in December 2011 – more than a year before his termination.

[43] Though, for purposes of its analysis, the Court assumed Plaintiff met his burden to establish a *prima facie* case on his FMLA and ADA claims, this assumption does not grant Plaintiff cover to avoid the ultimate inquiry that faces all suits of this type – i.e., whether the Plaintiff was subjected to discrimination *vel non. See, e.g., Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010) ("Courts must resist the temptation to become so entwined in the intricacies of the *McDonnell Douglas* proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non.*" (internal quotation marks and brackets removed) (citation omitted)). Thus, now "the issue boils down to whether the [P]laintiff has presented a triable question of intentional discrimination, and the *McDonnell Douglas* framework – with its presumptions and burdens – is no longer relevant." *Merritt*, 601 F.3d at 295; *accord Reeves*, 530 U.S. at 142-43 (discussing the reduced relevance of burden-shifting paradigm once the employer has met its burden of production); *Ennis*, 53 F.3d at 59.

Specifically, both Smith and Walker repeatedly gave Plaintiff good reviews and congratulated him on his work. Plaintiff was never disciplined while employed by Hickory White. Under Smith's supervision, Plaintiff received a raise; under Walker, he was offered a promotion (though he ultimately declined). Plaintiff testified that he had a good relationship with both Walker and Smith, and Smith testified that he considered Plaintiff to be a "tremendous" asset to Hickory White. Plaintiff testified that he liked Smith and got along with him. Plaintiff testified that his requests for leave were never turned down, and that he never heard anyone make negative comments about his use of FMLA leave or his medical conditions. Indeed, Plaintiff's testimony shows that Hickory White was accommodating to his leave requests on multiple occasions. Plaintiff has offered no evidence showing that either Smith, Walker, Crawford, or Childress (all persons with some sort of supervisory authority over him) held any discriminatory or retaliatory animus toward him. Moreover, the record shows that Plaintiff has not been replaced since being terminated. *See* [Doc. No. 16-13] at pp. 5-7 (Smith Deposition). Most critically, however, when asked by the defense whether he thought he was discriminated against, Plaintiff responded by admitting: "I don't know." *See* [Doc. No. 16-2] at pp. 49-50 (Plaintiff Deposition). At best – Plaintiff has created only a "weak issue" of fact regarding actual discrimination and retaliation *vel non*. This is insufficient to create a genuine issue of material fact for trial. *See Reeves*, 530 U.S. at 148.

While the Court acknowledges that Plaintiff earnestly disagrees with Smith's decision to terminate him; absent a showing of unlawfulness, federal law provides no remedy for the effects of mere business decisions respecting Plaintiff's employment status. Based on the evidence and arguments submitted by the parties, the Court finds that there is no genuine issue of material fact regarding whether the Defendants discriminated against Plaintiff on the basis of his alleged

disability, or whether they retaliated against him for his lawful use of FMLA leave.[44] Accordingly,

the Court **GRANTS** summary judgment to the Defendants on those respective claims.

C.    <u>Federal ADEA Claim</u>

Plaintiff conceded in his response brief that he could not proceed on his ADEA claim under

*Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420 (4th Cir. 2000). *See* [Doc. No. 19] at

pp. 19-20 (Plaintiff's Response Brief). Plaintiff's concession, coupled with his failure to oppose

Defendants' arguments, is fatal to his federal ADEA claim. *See, e.g., Bronitsky v. Bladen*

*Healthcare, LLC*, 2013 U.S. Dist. LEXIS 134820, at \*3-4 (E.D.N.C. 2013); *Harris v. hhgregg,*

*Inc.*, 2013 U.S. Dist. LEXIS 45394, at \*11-12 (M.D.N.C. 2013); *Allen v. Fed. Express Corp.*, 2011

U.S. Dist. LEXIS 34812, at \*26 n.5 (M.D.N.C. 2011); *Eady v. Veolia Transp. Services, Inc.*, 609

F.Supp.2d 540, 560-61 (D.S.C. 2009) ("The failure of a party to address an issue raised in summary

judgment may be considered a waiver or abandonment of the relevant cause of action."); *Brand v.*

*N.C. Dep't of Crime Control & Pub. Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004); *accord*

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010); *Jones v.*

*Family Health Ctrs., Inc.*, 323 F. Supp. 2d 681, 690 (D.S.C. 2003); *Mentch v. E. Sav. Bank, FSB*,

---

[44]  Plaintiff also appears to make a stray claim that, by terminating him while on FMLA leave and refusing to reinstate him to his position, the Defendants' failed to provide him with a reasonable accommodation for his alleged disability. *See* [Doc. No. 19] at p. 21-22 (Plaintiff's Response Brief). However, this claim fails because the Defendants *did* approve his request for leave (thus, he was accommodated). However, as is discussed below, Plaintiff's lawful use of FMLA leave does not entitle him to reinstatement to his prior position or an equivalent if he would have been terminated *sans* being on FMLA leave. Here, Hickory White instituted a RIF policy in January 2013 because it was faced with a huge financial predicament, a predicament and policy which Plaintiff does not contest. This RIF required the maintenance department to be reduced by two individuals. Plaintiff's apparent claim that he was entitled to a reasonable accommodation of continued FMLA leave, accompanied by subsequent reinstatement, is not warranted because the ADA does not mandate an employer to provide accommodations that "would impose an undue hardship" upon the employer. 42 U.S.C. § 12112(b)(5)(A). Because of the necessity of the RIF, and the difficult choice facing Smith, it is clear that allowing Plaintiff to be reinstated in the maintenance department following his FMLA leave would have imposed an "undue hardship" on Hickory White. *Id.* Therefore, Defendants did not fail to reasonably accommodate Plaintiff's alleged disability on that basis. Further, to the extent Plaintiff seeks to prove a failure to accommodate because Link did not approve his return to work with restrictions, this point is mooted by the fact that Plaintiff later obtained clearance to return to work without restrictions – thus, he had no need for a return-to-work accommodation. Lastly, Plaintiff plainly testified in his deposition that he never requested reasonable work accommodations from the Defendants for issues arising out of his alleged eye problem. Plaintiff is bound by this admission.

949 F. Supp. 1236, 1247 (D. Md. 1997). Accordingly, Defendants' Motion is **GRANTED** as to Plaintiff's federal age discrimination claim.

D.      <u>FMLA Interference Claim</u>

Plaintiff has also plead and argued that the Defendants interfered with his FMLA rights by terminating his employment. To establish a claim for FMLA interference, an employee must prove that: (1) he was an eligible employee; (2) his employer was covered by the statute; (3) he was entitled to leave under the FMLA; (4) he gave his employer adequate notice of his intention to take leave; and (5) the employer denied him FMLA benefits to which he was entitled. *See Rodriguez v. Smithfield Packing Co.*, 545 F.Supp.2d 508, 516, 523 (D. Md. 2008). Plaintiff has only argued that Defendants interfered with his FMLA rights by terminating him and refusing to allow him to return to his prior position at the conclusion of his leave period. *See* [Doc. No. 19] at pp. 14 n.13, 15 (Plaintiff's Response Brief). "The Fourth Circuit analyzes claims that an employer failed to restore an employee to his or her pre-FMLA position under the interference theory . . . ." *Santorocco v. Chesapeake Holding Co., LLC*, 2010 U.S. Dist. LEXIS 58160, at *10 (D. Md. 2010) (citing *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 550-51 (4th Cir. 2006)). An FMLA interference claim differs from an FMLA retaliation claim in that "motive is largely irrelevant when analyzing an interference claim." *See Santorocco*, 2010 U.S. Dist. LEXIS 58160, at *11. However, "FMLA leave does not provide an employee any greater rights than he or she would have had without taking leave." *Mercer v. Arc of Prince Georges Cnty., Inc.*, 532 F. App'x 392, 396 (4th Cir. 2013); *accord* 29 U.S.C. § 2614(a)(3)(B) (2013) ("[N]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.").

Assuming Plaintiff has established a *prima facie* case of interference, the Plaintiff's claim must still fail if it is shown that he was discharged for a legitimate reason – the 2013 RIF – and that Plaintiff "would not otherwise have been employed at the time reinstatement is requested."[45] *See Yashenko*, 446 F.3d at 547; *accord Pruitt v. Peninsula Reg'l Med. Ctr.*, 2014 U.S. Dist. LEXIS 86180, at *9 (D. Md. 2014) ("[The] distinction [between retaliation and interference claims] is not particularly pertinent . . . because the dispositive inquiry, regardless of the claim, is whether [the employer] discharged [plaintiff] for a legitimate reason." (citing *Yashenko*, 446 F.3d at 547 ("We join our sister circuits in concluding that the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave."))). As one court has concisely stated:

> [I]t appears that the Court should focus its attention on evidence either supporting or refuting a claim that the employer would not have retained the employee, at that position, or its equivalent, even if the employee had not been on FMLA leave. In other words, although motive for the employment decision is largely irrelevant, the evidence must show that the employer did not make the employment decision because the employee took FMLA leave.

*See Santorocco*, 2010 U.S. Dist. LEXIS 58160, at *14 (internal quotation marks and citation omitted). Here, the undisputed evidence shows that Hickory White was in dire financial straits during the time period in which Plaintiff took his FMLA leave for eyelid surgery. The evidence shows that, as a result of the company's financial troubles, upper management made the decision to institute a reduction-in-force consisting of eight employees. Those same individuals determined that two persons had to be laid off from the maintenance department, the same department which

---

[45] Plaintiff argues that the Fourth Circuit has not yet determined whether the employer or employee carries the burden to show that the employee would have been terminated even if not on FMLA leave. [Doc. No. 19] at pp. 16-17 (Plaintiff's Response Brief). The Court need not resolve this inquiry because, under either proof scheme, the undisputed record evidence shows that Plaintiff would have been terminated in the 2013 RIF regardless of his FMLA status.

employed Plaintiff. While the decision regarding whom to terminate was left to Smith as "acting" supervisor of the department, the decision to institute the RIF and to lay off two maintenance employees did not come from Smith, nor was Smith a part of that decision. Plaintiff has produced no evidence to suggest that FMLA status played any role in those individuals' decision to institute the RIF or to employ it in the maintenance department. Thus, it is undisputed that, regardless as to whether Plaintiff was on FMLA leave, the 2013 RIF would have been implemented, and it would have been applied against two maintenance employees.

Now, Plaintiff does not dispute that two of the five maintenance employees should have been retained – i.e., Childress and Crawford. Thus, only three maintenance employees remained that could be subjected to the 2013 RIF – Powell, Chaffin, and Plaintiff. Necessarily, one of the terminated employees would have had to have been on FMLA leave. Defendants have brought forth undisputed evidence that the decision to retain Powell resulted from Smith's assessment of his qualifications as a welder, fabricator, and machinist as compared to the skills of Chaffin and Plaintiff. Plaintiff offers no substantially probative evidence to refute the Defendant's proffered reason for applying the RIF against him, or to support his assertion that the decision was made because he was on approved FMLA leave. *See Santorocco*, 2010 U.S. Dist. LEXIS 58160, at *17.

Plaintiff argues that the case law only supports granting summary judgment where an entire department or job title is eliminated, or where preexisting performance or conduct issues would support the termination of an employee seeking FMLA leave. *See* [Doc. No. 19] at p. 18 (Plaintiff's Response Brief). However, the Court does not read the case law as restrictively as Plaintiff. Rather, the Fourth Circuit requires only that the record evidence show that the Plaintiff "would not have otherwise been employed at the time reinstatement is requested;" or, in other words, that "[Plaintiff] would have been discharged had he not taken leave." *Yashenko*, 446 F.3d at 547. Here,

the evidence shows that a legitimate RIF was instituted out of operational and business necessity. It also shows that the relevant decision-maker had to eliminate two employees out of three prospective candidates, two of which were on FMLA leave. The record contains no evidence that the decision to implement the RIF took into account FMLA use or status as an element of decision. The evidence also shows that the Plaintiff's position has not been filled with a replacement in the years since the RIF. As is discussed in Section III.B.3., supra, Plaintiff has proffered no evidence to demonstrate a triable issue as to the veracity of Defendants' explanation or reasoning.

Critically, Plaintiff's position would lead to the type of "anomalous result" rejected by the Fourth Circuit in *Yashenko*. *See Yashenko*, 446 F.3d at 548. Under Plaintiff's theory, Plaintiff and Chaffin would have been given "greater rights than those provided to" Powell (and Crawford and Childress) merely because Plaintiff and Chaffin were both on FMLA leave at the time the 2013 RIF was implemented. *See Yashenko*, 446 F.3d at 548. This scenario would have resulted in two anomalous results: (1) Powell would have to have been terminated even though Smith considered him to be more qualified than Plaintiff and Chaffin; and (2) Smith would have had to either refuse to implement the command from upper management to terminate two employees from maintenance (thus, likely placing his own job in jeopardy), or he would have had to terminate *another* employee whom he considered to be more qualified than Plaintiff and Chaffin – i.e., either Crawford or Childress. This Court, like the Fourth Circuit, does not construe the FMLA to impose such an unusual burden on the legitimate business decisions faced by employers under those types of circumstances; to do so would "upset[] the careful balance that Congress has created between employees' need for protected family and medical leave and employers' need to protect their legitimate business interests – an outcome wholly inconsistent with the purposes and goals of the FMLA." *See Yashenko*, 446 F.3d at 548.

All of the record evidence, when compared to Plaintiff's mere speculations (which are insufficient to overcome summary judgment), persuades the Court that Plaintiff would not have remained employed by Hickory White had he not been on FMLA leave at the time the 2013 RIF was implemented. Indeed, the FMLA "provides no absolute right to restoration to a prior employment position." *Yashenko*, 446 F.3d at 549. Accordingly, summary judgment is **GRANTED** to Defendants with respect to Plaintiff's FMLA interference claim.

E.    State Law Claims

Like his ADEA claim, Plaintiff concedes that summary judgment should be entered against his age-based NCEEPA claim. *See* [Doc. No. 19] at pp. 19-20 (Plaintiff's Response Brief). Accordingly, Defendants' Motion is **GRANTED** as to Plaintiff's state law age discrimination claim.

With respect to Plaintiff's remaining state law disability discrimination claim under the NCEEPA, the Court is similarly required to grant summary judgment in favor of the Defendants. Under North Carolina law, a disability discrimination claim tracks the standards required to prove a federal claim under the ADA. *See*, *e.g.*, *N.C. Dep't of Corr. v. Gibson*, 301 S.E.2d 78, 82-84, 308 N.C. 131 (N.C. 1983); *Youse v. Duke Energy Corp.*, 614 S.E.2d 396, 401-402, 171 N.C. App. 187 (N.C. Ct. App. 2005). If Plaintiff's ADA claim fails, then his state-based disability claim must also fail. *See Youse*, 614 S.E.2d at 402 ("[S]ince the Middle District determined that plaintiff had failed to prove, under the ADA, that she was discriminated against based on her disability, we find that plaintiff's state law claim based on the same factual allegation of disability discrimination is collaterally estopped."). As is discussed above, the Court has granted summary judgment to the Defendants on Plaintiff's claim of disability

discrimination made pursuant to the ADA. *See supra*. Accordingly, the Court **GRANTS** summary judgment to the Defendants on Plaintiff's state law disability discrimination claim.

        F.        <u>Damages</u>

Because the Court has granted summary judgment in favor of the Defendants on all of Plaintiff's substantive claims, the Court declines to address any of the Defendants' arguments regarding Plaintiff's claimed damages. Those arguments are mooted as a result of the holdings discussed throughout this Order.

**IV.    DECRETAL**

**IT IS, THEREFORE, ORDERED THAT**

(1)    Defendants' Motion for Summary Judgment (Doc. No. 16) is **GRANTED**;

(2)    Plaintiff's Motion to Strike the Declaration of William Smith (Doc. No. 17) is **DENIED**;

(3)    Plaintiff's Motion to Strike the Declaration of Jimmie Link (Doc. No. 18) is **DENIED**; and

(4)    Judgment is hereby entered in favor of the Defendants, against the Plaintiff, and this case shall be administratively terminated.

**SO ORDERED**.

Signed: December 7, 2015

Richard L. Voorhees
United States District Judge